891 So.2d 353 (2002)
Gary Frank KEY
v.
STATE of Alabama.
CR-99-0220.
Court of Criminal Appeals of Alabama.
March 1, 2002.
Opinion on Return to Remand May 31, 2002.
Rehearing Denied January 24, 2003.
*359 Warren Freeman, Delta, for appellant.
William H. Pryor, Jr., atty. gen., and David R. Clark, asst. atty. gen., for appellee.
COBB, Judge.
Gary Frank Key was convicted by a jury, following a guilty plea, of the capital murder of his ex-wife, Debra. Key admitted that he fired shots into the vehicle in which Debra was a passenger and that he wounded her fatally. § 13A-5-40(a)(17), Ala.Code 1975. Following a sentencing hearing, the jury recommended by a 12-0 vote that a death sentence be imposed. The trial court held a separate hearing, determined that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Key to death. Key obtained new counsel and filed a motion for a new trial. Following a hearing, the trial court denied the motion for a new trial. This appeal follows.

Facts
After a 13-year marriage, Gary Key and Debra Key divorced on September 22, 1997. Debra continued to experience problems with Key, and she filed stalking charges against him. On January 16, 1998, Key was indicted for aggravated stalking. On July 30, 1998, Key negotiated a guilty plea to the aggravated-stalking charge, and he was sentenced to a 10-year term of imprisonment. He applied for probation, which the State did not oppose, and the court set a probation hearing for September 1998.
At approximately 6:15 p.m. on July 31, 1998, the day after Key pleaded guilty to aggravated stalking, Debra and her best friend, Robbie Doyle, were in Doyle's automobile. They stopped for a moment in a parking lot, and Doyle noticed that an automobile pulled up next to hers. Doyle told Debra that Key was next to them, and Debra said, "Run." Doyle drove away from Key's vehicle and into a service station parking lot. As she drove through the parking lot, she screamed to bystanders, "Call the law. He's going to kill us." (R. 707.) Key pursued them in his car, and he rammed his car into Doyle's as she left the service station. Doyle sped away, but was forced to slow down because of traffic conditions. Key rammed her car twice more. Doyle lost control of her vehicle, which spun around and landed in a ditch.
As a result of the accident, Debra was thrown to the floor on the passenger side of the car. She was searching for a pistol that she carried with her, but was unable to find it. Doyle realized that Key was at the driver's side door, holding a long gun. Doyle told Debra to continue searching for the gun while she attempted to talk with Key. Key ordered Doyle to tell Debra to get out of the car, and Doyle explained to him that Debra's car door was against the ditch and that her own car door was up in the air, so she asked Key to help them get out of the car. A woman passing the scene stopped her car and she heard Key screaming at the women to get out of the car. When Key saw the passerby, he told her to go on, and the woman left. Key *360 twice more told Debra to get out of the car, then he fired a shot that struck Doyle in the left breast. Doyle slumped to the side, facing Debra, who was still on the floorboard of the car. Doyle said she heard five or six shots and saw Debra's body jump as it was struck by the gunshots. As the women screamed, Key walked away from them, got into his car, and drove away. Forensic tests later revealed that Key had fired an SKS assault rifle into the car. Doyle next heard a woman outside the car asking if they needed an ambulance, and the woman left to summon emergency technicians. Doyle said that she and Debra reached out and interlocked their little fingers. Debra said, "I can't breathe. I'm going to die." (R. 720.) Debra was conscious when emergency workers arrived, and she told a paramedic that her ex-husband had run her and her best friend off the road and had shot them. Debra sustained gunshot wounds to her face, upper chest and abdomen. Her liver and spleen were shattered, her colon was damaged, she had a hole in her diaphragm. She underwent two or three hours of surgery, and died soon after surgery.
Key was apprehended the next day. Officers did not detect the odor of alcohol about Key, and Key did not exhibit any problems communicating with the officers. In his statement to the police, Key denied any involvement in the shooting. Key acknowledged that he had been in court on the stalking charge and said that he had been recommended for probation. He denied ingesting alcohol or other drugs on the day Debra was shot, and he claimed that he had not ingested drugs in more than a year. (R. 816.)
At the penalty phase of the trial, Dr. Warner, the medical examiner who performed the autopsy on Debra's body, testified that he observed five gunshot wounds. One bullet entered Debra's left cheek, exited the left side of her chin, then reentered her left upper chest and traveled through her breast, and exited the body. Dr. Warner testified that this bullet would not have caused Debra's death, but as it "burn[ed] along the wound pathway, tear[ing] up the skin," it would have been very painful. (R. 940.) Dr. Warner testified that another bullet passed through Debra's left breast, then grazed her abdomen. That wound would not have been fatal, but would have been very painful due to the sensitivity of the breast. A third bullet penetrated Debra's right breast and exited her body. The fourth bullet wound Dr. Warner identified began in the lower chest, passed through the thoracic and abdominal cavities, and exited at the left hip. According to Dr. Warner, the path of the final bullet penetrated the left upper abdomen, traveled through the internal viscera, and exited at the left hip. Dr. Warner testified that the fourth and fifth wounds he identified caused extensive damage to Debra's heart, liver, spleen, and intestines, and were the fatal wounds. He further stated that wounds to the liver are "exquisitely painful." (R. 953.) The pain associated with damage to the lungs, intestines, and heart would have been painful. Dr. Warner stated that Debra was rapidly incapacitated but that she suffered a slow death.
One of the paramedics who transported Debra from the scene testified that she was conscious until she was anesthetized for surgery. Debra told him she was in pain and that she could not breathe. The paramedic testified, "She had approximately a softball sized hole in her left upper chest ... [and] it wasn't surprising that she couldn't breathe." (R. 983.) Debra asked the paramedic if she was going to die and repeatedly said she saw angels around her.
*361 At the penalty phase of the trial, Key presented testimony from his brother, who stated that their father was abusive and that Key had had a bad temper when he was younger. He said that Key suffered a broken neck when he was approximately six or seven years old, and that he suffered from headaches thereafter. Key's brother testified that Key became angry when Debra left him, and he heard Key say that if he could not have Debra, no one could have her. He also said he was going to kill Debra.
Dr. John Goff, a psychologist, testified on Key's behalf. He stated that Key suffered from a borderline personality disorder. Goff's evaluation of Key indicated to him that Key had a delusion that Debra was having a homosexual affair, and that the affair prevented Debra's reconciliation with him. He said that Key apparently became enraged over his perception of the circumstances and was probably not in control "from a psychological standpoint" when he shot Debra. (R. 1125-27.) Dr. Goff testified that it was not relevant to his diagnosis that one day before the murder Key pleaded guilty to stalking Debra or that Key had lied to the police when he was apprehended. Key told Dr. Goff that he had abused cocaine and alcohol in the days before the murder and that he remembered firing the first shot into Doyle's car. The prosecutor asked Dr. Goff about a document Key filed in September 1999 in a court proceeding involving a civil matter in which Key denied using drugs or alcohol before the incident and in which he said Robbie Doyle caused the crash. Dr. Goff testified that Key's statements in that document were irrelevant to his diagnosis. Joann Terrell, a licensed clinical social worker, testified about the psychosocial assessment she conducted of Key. She testified that she interviewed Key and several members of his family and that she reviewed Key's school and psychological records. Terrell testified that Key exhibited disruptive behavior as a child and that he suffered physical and emotional abuse in his home. She said that Key was impulsive and self-destructive and that he experienced uncontrolled rage. Terrell said Debra was the only person who took an interest in Key and that when she left him, he wanted her back and began stalking her. Terrell said that Key's guilty plea to aggravated stalking the day before the murder was not relevant to her evaluation of Key. The prosecutor read into the record a letter Key had written to his daughter while he was awaiting trial for this capital murder. The letter stated:
"`For two years I tried to tell your mother not to put me in jail but someone kept getting her to. On July 30th they give [sic] me ten years and I just can't do it. So I lost you and your mother and my life, too.'"
(R. 1259.)
Terrell said that the letter did not indicate to her that the guilty plea and 10-year sentence were motives for the murder. She stated that the murder was the result of "a horrible chance encounter" and impulsive acting out. (R. 1259.) Key told Terrell that he did not intend to shoot Robbie Doyle and that he meant only to shoot out the car window when he shot Doyle.
The prosecutor presented the testimony of the clerk of the Calhoun Circuit Court to show that, on July 30, 1998, Key entered into a plea agreement in the aggravated-stalking case, was sentenced to 10 years' imprisonment, and applied for probation. The plea-agreement form included a notation regarding a 1985 conviction for first-degree assault.
At the conclusion of the sentencing hearing, the jury deliberated for less than two hours before returning a unanimous recommendation *362 that Key be sentenced to death.
The trial court held a separate sentencing hearing to consider the aggravating circumstances and the mitigating circumstances and to impose sentence on Key. No additional testimony was offered at the hearing. When given the opportunity to speak on his behalf, Key told the court that he wanted Debra's entire family to know that he was sorry for what he had put them through but that he did love Debra. He said, "I didn't kill her out of hate." (R. 1496.) The trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Key to death. The trial court subsequently issued a written sentencing order and discussed the evidence offered by the parties as aggravating and mitigating circumstances.[1]
Key obtained new counsel and filed a motion for a new trial. On April 12, 2000, the court held a hearing on the motion. The court heard testimony from Key, one of his trial attorneys in the capital case, two of Key's friends, and the attorney who represented Key in the 1998 aggravated-stalking case. After considering the testimony, the court denied the motion for a new trial.

I.
Key's guilty plea was taken pursuant to the provisions of § 13A-5-42, Ala.Code 1975, which provides that a defendant indicted for a capital murder may plead guilty to the crime, but that the State must prove to a jury the defendant's guilt beyond a reasonable doubt. The statute also provides that the guilty plea shall have the effect of waiving all non-jurisdictional defects in the guilt phase of the proceeding, except for the sufficiency of the evidence. Accordingly, we have reviewed the guilt phase of the proceedings for jurisdictional errors. We have reviewed the penalty phase of the proceeding for any error, including plain error, as this Court is required to do.
"As with every case involving the death penalty, this Court must review the record for any plain error, i.e., for any defect in the proceedings whether or not it was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., defines this Court's responsibility when reviewing a death-penalty case. This section states:
"`In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'
"As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999):
"`The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affects the fairness, integrity or *363 public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).'
"While the failure to object will not preclude this Court from reviewing an issue in this case, it will weigh against any claim of prejudice [the appellant] makes on appeal. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."
Dorsey v. State, 881 So.2d 460, 472-73 (Ala.Crim.App.2001).

II.
Although neither of the parties presented a claim regarding the sufficiency of the trial court's sentencing order, our review of the order indicates that it is not in full compliance with § 13A-5-47(d), Ala.Code 1975, and that we must remand this case.
"[O]ur review of the record reveals that the trial court's capital sentencing order in this case is deficient in that the court failed to comply with the requirement in § 13A-5-47(d), Ala.Code 1975, that it `enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49 [and] each mitigating circumstance enumerated in Section 13A-5-51.' (Emphasis added [in McNabb].) Although the trial court thoroughly addressed those statutory aggravating circumstances and statutory mitigating circumstances that it expressly found to exist, it did not make specific findings regarding the existence or nonexistence of the remainder of the statutory aggravating and mitigating circumstances in §§ 13A-5-49 and 13A-5-51. Therefore, we remand this case to the trial court for it to amend its sentencing order with specific findings regarding the existence or nonexistence of each statutory aggravating circumstance in § 13A-5-49 and each statutory mitigating circumstance in § 13A-5-51, and, if necessary, to reweigh the aggravating and mitigating circumstances and resentence McNabb."
McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App.2001).
Although the trial court entered an extensive order and discussed much of the evidence presented at the sentence hearing, the court failed to enter specific findings as to each aggravating circumstance, each statutory mitigating circumstance, and each nonstatutory mitigating circumstance. The court also failed to discuss the weight it accorded the jury's sentencing recommendation. Based on the requirements of § 13A-5-47(d), Ala.Code 1975, and previous decisions of this Court, e.g., McNabb v. State, supra, and cases cited therein, we must remand this cause for the circuit court to enter a sentence order that addresses each statutory aggravating circumstance, each statutory mitigating circumstance, and each nonstatutory mitigating circumstance. The court may reweigh the aggravating circumstances and the mitigating circumstances, if necessary. On return to remand, we will review the sentence imposed by the trial court.
The record before us is otherwise complete, so we will conduct all other aspects of our review at this time.

*364 III.
In Issues I through IV of his brief to this Court, Key argues that the trial court erred when it admitted evidence of his July 30, 1998, conviction for aggravated stalking of the victim entered the day before the murder. Relying on a variety of constitutional provisions, Key claims that evidence of the prior stalking conviction was irrelevant and that any probative value it might have had was outweighed by the unfair prejudice it caused. This is a nonjurisdictional matter that was waived by Key's guilty plea.
Even if the claim had not been waived by Key's guilty plea, we would have found no error, because the trial court did not abuse its discretion when it admitted the evidence. The evidence was clearly relevant because it demonstrated Key's motive for the murder. The evidence was not admitted simply to prove Key's bad character; it was more probative than prejudicial. Key's specific claims will be discussed in detail below.
In Issues I and II of his brief, Key contends that the admission of evidence regarding his prior stalking conviction, when he did not testify at trial, violated numerous of his constitutional rights. In Issue III of his brief to this Court, Key argues that the prosecutor's reference to the prior aggravated-assault conviction in his opening statement constituted an amendment to the indictment, so that, he argues, he was tried for an offense (i.e., stalking) not charged in the indictment. In Issue IV of his brief, Key argues that the trial court committed reversible error when it failed to instruct the jury that the evidence was not to be considered as substantive evidence of Key's guilt in the crime charged. Even if the issues had not been waived, we would have found no error related to the evidence of Key's prior conviction for aggravated stalking of the victim.
Key's first assertion is that evidence of the aggravated-stalking conviction entered on July 30, 1998, the day before the murder, was irrelevant and unduly prejudicial.
"Alabama law has consistently held that collateral act evidence is admissible for such purposes. In Campbell v. State, 718 So.2d 123 (Ala.Crim.App.1997), this Court explained:
"`"`"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."' `"This exclusionary rule is simply an application of the character rule, which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."' Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. `"The jury's determination of guilt or innocence should be based on evidence relevant to the crime."'
"`"`If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of *365 bad character, then proof of such other act is admissible.' The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"'
"718 So.2d at 128 (citations omitted). See also Rule 404(b), Ala.R.Evid.; Charles W. Gamble, McElroy's Alabama Evidence § 69.01 (5th ed.1996)."
McClendon v. State, 813 So.2d 936, 943 (Ala.Crim.App.2001) (citations omitted in McClendon).
Furthermore, this Court has held on numerous occasions that evidence of motive is always admissible. E.g., Ex parte Register, 680 So.2d 225, 226-27 (Ala.1994); McClendon v. State, 813 So.2d at 944.
Moreover, as we held in Travis v. State, 776 So.2d 819, 858 (Ala.Crim.App.1997)(quoting Twilley v. State, 472 So.2d 1130, 1135-37 (Ala.Crim.App.1985)):
"The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State, 81 Ala. 20, 1 So. 577 (1887); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala.App. 477, 149 So. 356 (1933)."
Furthermore, Rule 404(b), Ala. R. Evid., provides that evidence of prior crimes or acts is not admissible to show action in conformity therewith, but such evidence may be admissible for other purposes, such as to prove motive, intent, or plan. Alabama courts have repeatedly held that trial courts have broad discretion in determining whether to allow evidence of collateral crimes or acts as part of the State's *366 case-in-chief. E.g., Howell v. State, 627 So.2d 1134, 1138-40 (Ala.Crim.App.1993); Guthrie v. State, 616 So.2d 914, 924-25 (Ala.Crim.App.1993).
Key killed his ex-wife on July 31, 1998. The State presented evidence that, on July 30, 1998, Key had entered a guilty plea to the aggravated stalking of his ex-wife, and was sentenced to 10 years in prison. The State also presented evidence introduced as part of the aggravated-stalking charge  that Key and his ex-wife divorced after more than a decade of marriage, that a permanent restraining order had been entered against Key as part of the divorce judgment, and that Key had violated the order and was charged with aggravated stalking.
As the State argues, evidence of the events leading up to the murder, especially the judgment of conviction and sentence for aggravated stalking entered the day before the murder, established Key's motive for killing his ex-wife. As Key himself explained to his daughter in a letter while he was in jail for the murder: "For two years I tried to tell your mother not to put me in jail but someone kept getting her to. On July 30th they give [sic] me ten years and I just can't do it. So I lost you and your mother and my life, too." (R. 1259.) Whether to admit the collateral evidence as proof of motive was a matter within the trial court's sound discretion. Even if the claim had not been waived by Key's guilty plea, we would have found no abuse of discretion in the court's decisions regarding the admission of the collateral evidence.
Key argues that the trial court erred in admitting the evidence because he pleaded guilty to capital murder. As the State correctly notes in its brief to this Court, however, even though Key entered a guilty plea in this case, Alabama's capital-murder statute required the prosecution to prove Key's guilt beyond a reasonable doubt to the jury, and it had to present evidence to support its case. § 13A-5-42, Ala.Code 1975. The burden of proving that Debra Key had been shot and killed while she was in a vehicle and that Gary Key had fired the fatal shots remained on the prosecution even though Key pleaded guilty to capital murder. Davis v. State, 740 So.2d 1115, 1131 (Ala.Crim.App.1998), 740 So.2d 1135 (Ala.1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000). Key's motive for the killing was properly presented to the jury.
Key argues that the prosecutor's reference to the aggravated-stalking conviction in the opening statement served to amend the indictment and caused him to stand trial for a crime not charged in the indictment. This claim was waived by Key's guilty plea. Even if Key had not waived the issue, however, we would have found no error. Before the parties made their opening statements, the trial court instructed the jury that counsel's arguments did not constitute evidence in the case. (R. 630.) The trial court reminded the jury at the conclusion of the guilt phase that the attorney's arguments were not evidence in the case. (R. 878.) The court also read the indictment to the jury and explained that Key was charged with capital murder. (R. 878-79.) Key has offered no law or facts to support his allegation that the indictment had been "amended."
Key argues that plain error occurred because the trial court failed to sua sponte charge the jury that evidence of his prior conviction could be considered for impeachment purposes only. Key relies on Ex parte Minor, 780 So.2d 796 (Ala.2000). The State contends that Ex parte Minor is distinguishable, because Key did *367 not testify and because the evidence of his prior conviction was not offered for impeachment purposes. Rather, the State argues, the evidence was offered as proof of his motive to murder his ex-wife. The State's analysis is correct. In Ex parte Minor, the Alabama Supreme Court held that plain error occurred when the trial court failed to instruct the jury that evidence of Minor's prior conviction was admitted only for purposes of impeachment. As the State correctly argues, the evidence here was not offered to impeach Key, as was the case in Ex parte Minor. This case is more closely analogous to Perkins v. State, 808 So.2d 1041, 1092-93 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). In Perkins, a capital-murder case, this Court held that a trial court's failure to instruct the jury that evidence of collateral crimes could be used only for the limited purpose of showing intent or motive was not plain error, when the defendant failed to request a limiting instruction. Even if Key's claim regarding the jury instruction had not been waived by his guilty plea, we would have found no plain error, and Key would not have been entitled to any relief.
Based on the foregoing, even if the claims regarding the prior conviction for aggravated stalking had not been waived by the guilty plea, we would have held that no reversible error occurred.

IV.
In Issue V of his brief to this Court, Key argues that the circuit court erred when it permitted the victim's sister to testify about the victim's character, because, he says, the evidence was irrelevant and prejudicial. The State correctly notes that Key did not raise this claim at trial. More importantly, Key's guilty plea to capital murder waived from review all nonjurisdictional guilt-phase claims, such as this one. Even if this claim had not been waived by Key's guilty plea, Key would not have been entitled to any relief on the claim, because no plain error occurred.
Key objects to the testimony of Kathy Hurst, the victim's sister. Hurst testified that her sister and Key met approximately 20 years earlier, that they were married for 13 years, and that they had one child. Hurst also testified that her sister filed for divorce and obtained custody of their daughter and ownership of the marital home, that Debra became friends with a coworker, Robbie Doyle, and that Debra obtained her GED certificate a few months before she was murdered. (R. 652-59.) Hurst identified a photograph of the victim. (R. 656-57.)
Contrary to Key's assertion on appeal, Hurst's testimony was relevant and probative. The victim was dead and was obviously unable to testify about her marriage to Key, their child, their divorce, and her efforts to move on with her life after the divorce. Testimony from another person was necessary to establish that the victim and the defendant had had a long relationship, that that relationship had ended, and that the victim had received custody of their daughter and possession of the marital home. Hurst also testified that her sister had established a relationship with Robbie Doyle, the woman who was driving the car on the day Key chased the women and shot them. This evidence was relevant to establish the sequence of events leading up to the murder and as evidence of Key's motive for the murder. Key could not have established plain error as to this issue.
Admission of the photograph of the victim was also not plain error. Alabama courts have often held that a photograph of the victim, taken while the victim was living, is admissible for purposes of identification. E.g., Living v. State, 796 So.2d *368 1121, 1143 (Ala.Crim.App.2000). The State was entitled to prove the identity of the victim, even if her identity was not disputed. Accordingly, we would have found no plain error, even if the claim had not been waived.
Testimony about the victim and the admission of the photograph of the victim while she was living were proper, and would not have entitled Key to a finding of plain error, even if the claims had not been waived by Key's guilty plea. Because this nonjurisdictional claim was waived, Key is not entitled to any relief.

V.
In Issue VI of his brief to this Court, Key argues that § 13A-5-40(a)(17), Ala.Code 1975, the section of Alabama's capital-murder statute under which he was indicted, is unconstitutionally vague and arbitrary and that it violates principles of equal protection. He argues to this Court, as he argued to the court below in a Motion to Dismiss Capital Count (C. 106) and in a hearing on that motion (R. 212-13), that the statute was intended to make capital offenses drive-by shootings and carjackings that resulted in death. He argues further that, to punish a defendant whose victim was sitting in a car differently from a defendant whose victim stumbled away from a car violated equal-protection principles. This nonjurisdictional claim was waived by Key's guilty plea to the capital murder. We note, moreover, that the trial court correctly denied Key's motion to dismiss because Key was not entitled to relief on his claim. Alabama law does not support Key's allegations, and he would not be entitled to any relief on appeal, even if the claim had not been waived.
This Court has considered and rejected the constitutional arguments Key makes here. E.g., McGriff v. State, [Ms. CR-97-0179, Aug. 31, 2001] ___ So.2d ___, ___ (Ala.Crim.App.2001); Farrior v. State, 728 So.2d 691, 701-03 (Ala.Crim.App.1998). Based on the foregoing, Key would not have been entitled to any relief on this claim, even if it had not been waived by the guilty plea.

VI.
In Issue VII of his brief to this Court, Key argues that the trial court erred when it denied his motion to recuse. Specifically, he claims that the judge made public comments that reflected his personal remorse about his "possible role" in the failure of the judicial system to protect the victim and that further inflamed the public's opinion toward Key and, he says, prejudiced his case. He claims also that the court's ex mero motu order that Key receive a pretrial psychological evaluation might have indicated the court's personal bias or prejudice against him. Key's guilty plea waived all nonjurisdictional defects in the proceedings leading up to the guilty verdict. Because the trial judge presided over the penalty phase of the trial, however, we will review the claim as it applies to that portion of the trial. The State argues that the denial of the motion to recuse should be affirmed because, it says, the record reflects no evidence of bias or prejudice. We agree with the State.
A trial judge is presumed to be qualified and unbiased. Riddle v. State, 669 So.2d 1014, 1019 (Ala.Crim.App.1994). The party requesting a judge's recusal has a substantial burden; the party must present evidence establishing personal, extrajudicial bias, or prejudice on the part of the trial judge. Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.), cert. denied, 513 U.S. 1007, 115 S.Ct. 528, 130 L.Ed.2d 432 (1994). The judge's denial of a motion to *369 recuse will not be reversed absent clear evidence of bias or prejudice.
A brief recitation of the facts underlying this claim is relevant to our resolution of the issue Key has raised. On July 30, 1998, Key entered a guilty plea to a charge of aggravated stalking. Judge Samuel Monk accepted the guilty plea, set a probation hearing date, and allowed Key to continue on his existing bond. Because of a gap in the exchange of information between municipal courts and the state court system, Judge Monk was unaware on the day he took the plea that Key had, a few months earlier, been arrested for DUI and for carrying a loaded firearm in his vehicle. Key shot Debra the day after he entered the plea. Newspaper reporters interviewed Judge Monk, other judges, and attorneys following the murder. Judge Monk explained that municipal courts are not required to link their computer systems with the state's computer systems, and he was quoted as saying, "That's where the communication breakdown occurred in this case." (C. 98.) The newspaper articles indicated that judges and prosecutors were discussing changes in the way domestic-violence cases were handled when these cases were entered into the computer system. (C. 99-100.) At the hearing on the motion to recuse, Judge Monk stated:
"[A]ll this Court has done or ever done in this case is explain how the system worked and how the system may have had a failing in it between the time Mr. Key pled on a stalking charge and the time this case arose.
"I think the only explanation to the media was simply that, one, there was a tremendous gap in the exchange of information between the municipalities in this state and the state court system in this state; that there was a lag in time because of that failure from the time the cities were able to submit that information to the . . . people in Montgomery and the time it actually became available. . . . . It was an explanation as to the procedures that were used and had  or the customary procedures that are followed in this court in regard to Mr. Key's stalking case.
"You will not find one piece of evidence, you will not find one person that will say I have ever discussed with them the facts of this case as to Mr. Key's alleged involvement other than what is in this file. That's all I know about this case. . . .
"I have a right, and when the system is under attack, I have a duty to explain how the system works; not to make excuses for the system, and you won't find a single excuse in the article. I explained to the [newspaper reporter] how the system worked, where the gaps and failings in the system were."
(R. 110-12.)
The judge further stated:
"Am I sorry Ms. Key is dead? Certainly. You are too, are you not?
"[DEFENSE COUNSEL]: I am.
"THE COURT: All right. [The prosecutor] is. Everybody in this community is sorry that anyone dies an untimely and violent death. Whether Key did that or whether Mr. Key is legally responsible for that is a matter to be determined and you won't find any statement that would lead any reasonable, prudent person to believe that I have any bias toward Mr. Key; that I have any lack of impartiality as to his case; or that I have prejudged whether or not he did in fact commit the act or whether he is criminally responsible for it."
(R. 112-13.)
Canon 3.A.(6), Alabama Canons of Judicial Ethics, provides that a judge should *370 not comment publicly on a pending case, but specifically does not prohibit judges from explaining to the public the procedures of the court system. We have reviewed the newspaper articles, and we conclude that Judge Monk did nothing more than explain the absence of an exchange of information between the court systems and suggested a remedy. Such public comment is permitted In re Sheffield, 465 So.2d 350, 354-56 (Ala.1984).
To the extent Key contends that Judge Monk stated that he "personally struggled internally and externally regarding the tragic events," and that the comments "reflect a personal remorse on the part of the lower court and its possible role in the system's failure to protect the victim" (Key's brief at p. 45), his argument is unsupported by a citation to the record, and appears to be false. This Court has examined the newspaper articles attached to the motion to recuse and has read the motion and the transcript of the hearing on the motion. Nowhere in its review of the record has this Court located any statement from Judge Monk indicating a "personal struggle" or a reflection of "personal remorse" or "its possible role in the system's failure." This portion of Key's claim is belied by the record; it must fail.
To the extent Key argues that the judge should have recused himself because he presided over the previous stalking case, review of this nonjurisdictional claim was waived as to the guilt phase by Key's guilty plea. The claim was not raised in the court below; it is reviewed now for plain error only as it relates to the penalty phase. Key cites no legal support for the proposition that a court may preside over no more than one criminal proceeding for each defendant. The proposition is not supported by the law or by logic. Heard v. State, 574 So.2d 873, 874 (Ala.Crim.App.1990)(a judge's pretrial involvement in a case does not require the judge's exclusion from the trial of the case).
Finally, Key argues, as he did in the circuit court, that Judge Monk "may be perceived to have a personal bias or prejudice against [Key] by ex mero motu ordering [Key] to Taylor Hardin Secure Medical Facility for psychological [a] evaluation." (C. 94-95; Key's brief at p. 46.) Key's guilty plea waived reviewed of this nonjurisdictional error as it relates to the guilt phase. Because Key raised this claim in the lower court, we will review it as it relates the penalty phase.
When Key raised this claim in circuit court, Judge Monk explained that, when Key appeared for arraignment, he made inappropriate facial expressions to the surviving victim and to the deceased victim's family. (R. 107.) The court further stated:
"[W]hen he came back over here later he was acting strangely and simply had the Ted Kaczynski [[2]] look. That was dishevelled, long hair and a beard. I never compared him to Ted Kaczynski in any way other than describing how he looked. Under the mandates of Wagner v. State [489 So.2d 623 (Ala.Crim.App.1985),] I have a judicial responsibility to ensure that that man is competent to proceed to trial, especially in a capital case, which is special. You had not raised the issue. And many times in a capital case the best defense is no defense. I have a judicial responsibility to *371 make sure that man's competent. I ordered him to [undergo] a competency evaluation....
"Now, I was protecting your client's rights. And I want to know how that shows bias."
(R. 107-08.)
Key offers no argument to refute the trial court's explanation that its order for a psychological evaluation was based on Key's appearance and behavior and that it was in compliance with the court's obligation to ensure that Key was competent to stand trial. We note, moreover, that in the psychological report submitted by Key's expert who testified at sentencing, Dr. Goff stated, "He has a beard which is rather poorly groomed and disheveled and he indicated to me that for some reason or another he was not being allowed to shave or trim his beard in the correctional setting. This gives the patient rather a grizzly look actually." (C. 280)(emphasis added). As we discussed previously, Key had the burden to establish clear evidence indicating bias or prejudice in the trial court's failure to recuse. Key has offered no evidence of bias or prejudice as to this portion of his claim, and we can find no bias or prejudice.
Based on the foregoing, we hold that, as to the guilt phase of the trial, Key's guilty plea waived review of any claim regarding the denial of is motion to recuse. As to the penalty phase, we find that the circuit court did not err when it denied Key's Motion to Recuse. The record contains no evidence indicating that Judge Monk had a personal bias or prejudice against Key. Key is not entitled to any relief on this claim.

VII.
In Issue VIII of his brief to this Court, Key argues that he was prejudiced by the State's use of peremptory strikes to remove blacks from the jury venire. Defense counsel made a motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), but the trial court denied the motion, stating that Key had failed to establish a prima facie case of discrimination. Key appears to raise a different claim on appeal. He now argues that the trial court erred when it failed to require the State to present race-neutral reasons for its strikes. It appears that Key's argument, stated differently, is that the trial court erred when it failed to find a prima facie case of discrimination. Key's guilty plea waived this nonjurisdictional claim from review as it relates to the guilt phase. Because the same jury heard the penalty phase of the proceeding, we will review the claim on appeal as it relates to that phase of the trial.
After the jury was stuck, Key made a Batson motion, and in support of the motion, he stated that the prosecutor struck 6 of the 12 black veniremembers, while the defense struck only 2 black veniremembers. (R. 613-14.) He stated that the prosecutor struck black veniremembers M.M., U.P., M.T.,[3] G.W., and W.B., while it did not strike similarly situated white veniremembers. (R. 614-18.) Key noted that the State also struck veniremember C.H., but said that it appeared that the State might have had good cause for striking C.H., because her son had been in State prison. (R. 618.) The trial court stated that it had been present during voir dire and had observed each veniremember in group voir dire and during individual voir dire. The court further *372 stated that Key had not established a prima facie case of discrimination, and it did not require the State to provide race-neutral reasons for its strikes.
The party making a Batson claim bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). A prima facie case of discrimination is not established by a mere recitation of the numbers of black veniremembers struck by the prosecution. E.g., Ingram v. State, 779 So.2d 1225, 1253 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). Only after the trial court determines that a prima facie case of discrimination has been established must the other party provide race-neutral reasons for its strikes. Batson, 476 U.S. at 97-98, 106 S.Ct. 1712. A trial court's ruling on a Batson motion will not be overturned on review unless the ruling was clearly erroneous. We find no error in the trial court's denial of Key's Batson motion.
Key's Batson motion consisted of a statement about the number of black veniremembers who were struck, a recitation of the names and ages of the veniremembers who were struck, and general claims that those veniremembers gave "similar responses" to those of veniremembers who were not struck. Key did not establish a prima facie case of discrimination, and the trial court correctly denied the Batson motion. Because Key failed to prove that the trial court's ruling was clearly erroneous, he is not entitled to any relief on this claim.

VIII.
In Issue IX of his brief to this Court, Key argues that imposition of the death penalty by electrocution is unconstitutional, and he asks this Court strike down the statute permitting this method of carrying out the death sentence. Key filed a posttrial motion challenging the imposition of the death penalty by execution and requesting the trial court to "strik[e] down, as unconstitutional, the imposition of the death penalty by electrocution." (C. 133-51.) The trial court denied Key's motion. We affirm the trial court's ruling.
The State correctly points out that federal and state courts have repeatedly held that death by electrocution does not constitute cruel and unusual punishment. E.g., Lowenfield v. Phelps, 817 F.2d 285, 298, (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ex parte Harrell, 470 So.2d 1309, 1317 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Williams v. State, 627 So.2d 985, 993 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). The claim Key raises has been decided adversely by the appellate courts of this state; the trial court correctly denied the motion to declare electrocution as a form of punishment unconstitutional. It is not for this Court to overturn the statutorily mandated form of execution that has been enacted by the State Legislature and upheld by the appellate courts of this State. We affirm the trial court's ruling.

IX.
In Issue X of his brief to this Court, Key argues that the trial court erred to reversal when it admitted into evidence autopsy photographs.[4] Key argues that the autopsy photographs were inflammatory and prejudicial, in light of *373 the fact that numerous photographs of the crime scene had already been admitted and in light of the fact that he had entered a guilty plea to capital murder. Key's guilty plea had the effect of waiving for purposes of review any claim regarding the admission of the autopsy photographs at the guilt phase. Because the evidence admitted at the guilt phase was also considered at the penalty phase, we will review the claim as it relates to the penalty phase of Key's trial.
First, we observe that the photographs Key describes as "autopsy photographs" might more accurately be described as "pre-autopsy photographs." The photographs depict the victim's wounds after they had been wiped clean and exposed, so the location and severity of the wounds was visible. However, none of the photographs contain any indication that an autopsy procedure had yet been performed on the victim. Alabama courts have often addressed the standards applicable to the review of a trial court's ruling on the admission of photographs of the victim:
"The history of the admission of autopsy photographs is extensive:
"`With regard to photographs of the victim, . . . even though they are cumulative and pertain to undisputed matters, generally photographs that depict the external wounds on the body of the victim are admissible. Bankhead [v. State], 585 So.2d [97, 109 (Ala.Crim.App.1989)]. As we held in Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), `[t]he state [has] the burden of proving that the victim [is] dead, and [photographs are] direct evidence on that point. . . .'
"Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996) (emphasis added.) Moreover, autopsy photographs depicting the internal views of wounds are likewise admissible. In Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App.1987), we stated that even though autopsy photographs of a victim's head injuries, as viewed internally, may be gruesome, admission of such photos is sometimes necessary to demonstrate the extent of the victim's injuries. See Dabbs, supra."
Broadnax v. State, 825 So.2d 134, 159 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001).
Alabama courts have consistently held that trial courts are vested with the broad discretion to rule on the admissibility of photographs and that the trial court's ruling would not be reversed unless the trial court abused its discretion. E.g., Biles v. State, 715 So.2d 878, 885 (Ala.Crim.App.1997), citing T.R.D. v. State, 673 So.2d 838 (Ala.Crim.App., 1995). We have reviewed the photographs that displayed the victim's body as it appeared before any autopsy procedures were performed, and we find nothing to indicate that the trial court abused its discretion when it admitted these photographs into evidence. Key is not entitled to review of the guilt-phase claim because he entered a guilty plea to capital murder. We reviewed the claim as it relates to the penalty phase, but have found no abuse of the trial court's discretion with regard to the admission of the photographs. For the foregoing reasons, Key is not entitled to any relief on this claim.

X.
In Issue XI-XIV and XVI-XIX of his brief to this Court, Key argues that trial counsel rendered ineffective assistance in a variety of ways. Key was appointed different counsel following his conviction and *374 sentence, and newly appointed (now appellate) counsel filed a motion for a new trial, claiming, in pertinent part, "The Defendant was denied effective assistance of counsel as guaranteed by the sixth amendment of the constitution." (C. 160-01.) Judge Monk, who presided over Key's trial in this matter, held a hearing on the motion. One of Key's trial attorneys, Ray Bryan, testified at the hearing, as did the attorney who represented Key in the previous aggravated-stalking case. Two of Key's friends testified, and Key testified on his own behalf. At the conclusion of the hearing, Judge Monk denied the motion for a new trial. The judge stated that the denial was based in part on Key's obvious inability to be truthful, and on the fact that some of the testimony he presented at the hearing contradicted the arguments he presented in support of the motion. (R. 1650-51.)
On appeal, Key claims that trial counsel were ineffective because: (1) they failed to argue at the guilt phase that Key was not guilty based on delusional compulsive disorder; (2) they failed to present a heat-of-passion defense at the guilt phase; (3) they failed to adequately challenge Key's waiver of his right to counsel during questioning; (4) they failed to challenge the State's evidence regarding aggravating circumstances; and (5) they did not object to the introduction of the victim-impact report at sentencing. Key also presents a "scattergun" issue in his brief, in which he argues that he "was prejudiced due to the ineffective assistance of counsel in the guilt phase and the penalty phase of trial." (Key's brief at p. 94.) In that issue, Key sets forth 13 subissues but presents little or no legal or factual argument in support of the claims; several of those subissues are cumulative of the other issues raised in brief regarding the ineffective assistance of counsel claim.
"A trial court's decision to deny a motion for a new trial will not be disturbed on appeal unless there is a clear showing of abuse of discretion, and this court will indulge every reasonable presumption in favor of the correctness of the trial court's ruling."
Mims v. State, 816 So.2d 509, 515 (Ala.Crim.App.2001).
In arguing that his counsel were ineffective, Key bears a heavy burden of proof. The legal standards governing claims of ineffective assistance of counsel are well established:
"`To prevail upon a claim of ineffective assistance of counsel, a defendant must satisfy the two components articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must show that counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. Strickland, supra. In Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Supreme Court held that the two-part Strickland test applies to challenges to guilty pleas based upon ineffective assistance of counsel.'
"Holt v. State, 650 So.2d 530, 531-32 (Ala.Cr.App.1994). That burden is particularly stringent when a defendant enters a guilty plea.
"`"In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in Tollett v. Henderson, [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)] and McMann v. Richardson, [397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)]. The second, or `prejudice,' requirement, on the other hand, focuses on whether *375 counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the `prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."'
"Williams v. State, 596 So.2d 620, 623 (Ala.Cr.App.1991)(quoting Hill v. Lockhart, 474 U.S. 52, 58 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985)). When reviewing an ineffective assistance of counsel claim, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985).
"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.)
"`We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. "Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable. . . ." Lawley, 512 So.2d at 1372. This court must avoid using "hindsight" to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App.1991).'
"Hallford v. State, 629 So.2d 6, 9 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994)."
Davis v. State, 740 So.2d 1115, 1132-33 (Ala.Crim.App.1998), aff'd, 740 So.2d 1135 (Ala.1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000).

A.
Key claims that trial counsel possessed evidence during the guilt phase of his trial that would have supported a defense of not guilty by reason of delusional-compulsive disorder, but that they failed to present the evidence until the penalty phase of trial. At the hearing on the motion for a new trial, trial counsel testified that, at the time of arraignment, a plea of not guilty by reason of mental disease or defect did not appear viable. He stated, "I didn't have any indication really after my talking with him that that was going to be a valid plea at that time. We just didn't consider it to be a plea that *376 we were going to use." (R. 1507.) Attorney Bryan also testified that he and cocounsel relied on the opinion of the expert clinical neuropsychologist, Dr. John Goff, who had been recommended by the Alabama Prison Project, and whom they retained to evaluate Key before trial. Bryan testified that Goff diagnosed Key's borderline personality disorder, and explained how that disorder and other psychological factors played a role in Key's actions. Goff advised them that Key's psychological problems did not rise to the level that would support a defense based on insanity. (R. 1548.) Goff advised them that they did not need to secure an additional evaluation of Key. Bryan testified that, because Goff had been the chief psychologist at a state psychiatric hospital for years and because he had undergone extensive training, he and cocounsel were comfortable relying on Goff's opinion. (R. 1535-36.) Bryan testified that Goff's findings confirmed his own belief, based on his experience and education in criminal law, that Key was not suffering from a mental disease so serious as to warrant an insanity plea. (R. 1548.) Counsel also acknowledged that he told the court at a pretrial hearing that it was his opinion that Key was competent to stand trial, and he based that opinion on all of the visits he had had with Key before that time. He further stated that, if the circumstances changed and he believed Key had a viable insanity defense, he would have filed a motion immediately to change Key's plea.
The evidence adduced at the hearing on Key's motion for new trial indicated that defense counsel had consulted with an expert clinical psychologist, and that, based on the expert's findings and his own contact with Key, there was no basis for a plea of not guilty by reason of insanity. This is precisely the type of strategic choice, based on counsel's examination of the relevant facts and legal principles, that our cases have deemed to be virtually unchallengeable. Because Key indicated his desire to plead guilty and because defense counsel had made an informed decision that Key did not have a valid insanity offense, counsel placed appropriate emphasis on the penalty phase of Key's trial in an attempt to save Key's life. There is no indication that trial counsel's emphasis on the penalty phase constituted deficient performance, or that Key suffered any prejudice as a result of this strategic decision.
Key failed to establish that trial counsel rendered deficient performance when they made the strategic decision not to present a defense that had no legal basis. Therefore, the trial court correctly denied this claim of error. As the trial court succinctly stated:
"Well, the day a lawyer is supposed to come in here and make motions and enter pleas for which he or she has no basis and in fact their education, training, experience, and their life's experience and their discussions with their [expert] provide them with no basis and you can say that that's incompetency[,] that's going to be a dark day in our legal system."
(R. 1529.)

B.
Key next claims that trial counsel were ineffective because they did not present a heat-of-passion defense at trial. The State correctly notes that Key presented no direct evidence regarding deficient performance or prejudice as to this allegation of error. When the prosecutor questioned trial counsel about the reasons for Key's guilty plea, Bryan testified that it was undisputed that Key shot his ex-wife while she was in the automobile. He knew of no way to present a defense based on the facts in this particular case. Bryan also *377 stated that he hoped that Key's guilty plea might convince the jury that he was accepting responsibility for his actions and that he was expressing remorse.
The foregoing testimony discloses trial counsel's strategy in presenting this case to the jury, especially given the fact that the only evidence was that Key intentionally shot his ex-wife. In the absence of any evidence supporting Key's claim that counsel was deficient in failing to present a heat-of-passion defense, Key has failed to overcome the presumption that the strategic choice was reasonable. Moreover, Key has failed to demonstrate any prejudice as a result of counsel's failure to present this defense. Thus, Key failed to establish either prong necessary to prove this ineffective assistance of counsel claim, and the trial court's denial of the motion for new trial is due to be affirmed as to this ground.

C.
Key next claims that trial counsel's performance was deficient because, he says, they failed to adequately challenge his waiver of his right to counsel during questioning. Specifically, he argues that defense counsel should have challenged his waiver of his Miranda v. Arizona 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights on grounds that he did not have the mental capacity to waive his rights due to his mental health history, his low level of intellectual functioning, and his substance abuse. He argues that trial counsel should have attempted to present evidence regarding these circumstances at the guilt phase of his trial in order to effectively challenge his waiver of rights.
Key presented no testimony at the posttrial hearing to support this claim. We note, however, that trial counsel filed a pretrial motion to suppress Key's statements, arguing that Key had not knowingly or intelligently waived his right to counsel. A hearing was held on this motion, and the police detective who took Key into custody and interviewed him testified that Key was able to communicate appropriately with the police, that he indicated that he understood his rights after they were explained to him, and that he did not appear to be under the influence of alcohol or any other substances. Nothing in the record now before us indicates that counsel rendered deficient performance by failing to present evidence regarding his history of substance abuse and mental disorders. Because the only evidence before us indicates that, at the time Key made his statement, he was able to understand and communicate with the officers and that he was not under the influence of any substances, Key has failed to establish deficient performance or prejudice. The trial court correctly denied this portion of the claim in the motion for new trial.

D.
Key next argues that trial counsel rendered ineffective assistance because, he says, they failed to adequately challenge the State's proposed aggravating circumstances. Specifically, he claims that defense counsel should have challenged the heinous, atrocious, or cruel aggravating circumstance; that they should have challenged the 1998 stalking conviction because, he says, he was under the influence of crack cocaine when he entered his guilty plea to that offense; and that counsel should have challenged the 1985 assault conviction because Key suffered from mental disorders and did not understand the criminality of the act when he committed it.
1. Key argues in his brief to this Court, "There was no testimony presented at trial that would justify the calling of this *378 crime tortuous." (Appellant's brief at p. 78.) He further argues that he shot the victim "after a short chase," that emergency personnel arrived soon after the shooting to remove her from the car and take her to the hospital. He concludes that trial counsel rendered ineffective assistance because they should have objected to the prosecution's reliance on this aggravating circumstance. At the hearing on Key's motion for new trial, trial counsel testified that he researched the law regarding the heinous, atrocious, or cruel aggravating circumstance, § 13A-5-49(8), Ala.Code 1975, and concluded that there appeared to be sufficient evidence to allow presentation of that factor to the jury for its determination. Trial counsel's evaluation of the law and of the circumstances of the case, and strategic decisions based on that evaluation, are virtually unassailable. E.g., Davis v. State, 740 So.2d 1115, 1132-33 (Ala.Crim.App.1998), aff'd, 740 So.2d 1135 (Ala.1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000). Moreover, Key has failed to establish that, even if counsel had objected to the State's reliance on this factor, the result of the proceeding would have been different. Our review of the evidence presented at trial indicates that Key was not prejudiced by trial counsel's failure to object to the prosecutor's reliance on this aggravating circumstance. In its final sentencing order, the trial court detailed the evidence that supported this circumstance, including the victim's realization, while she and her friend attempted to elude Key, that Key intended to kill her, that the victim and her friend "were trapped helplessly in that vehicle like animals in a trap," and that the victim remained conscious and suffering what a medical expert characterized as "exquisite pain." (Sentencing Order at pp. 13-14.) Key has failed to show deficient performance or prejudice. Therefore, the trial court correctly denied Key any relief on this claim.
2. Key next argues that trial counsel rendered deficient performance when they failed to challenge the admission of the 1998 stalking conviction and the transcript of that proceeding. Key contends that he entered a guilty plea to that charge while he was under the influence of crack cocaine, and that trial counsel were unaware of this fact because they did not properly investigate the plea. He also appears to argue that trial counsel should have objected to the introduction of the evidence about that conviction, because, he says, there was no factual basis for the stalking charge.
Conflicting evidence was presented at the hearing on the motion for a new trial regarding Key's alleged cocaine intoxication at the time he entered his guilty plea to the aggravated stalking charge. Key testified at the hearing that he had ingested cocaine during a break in the guilty-plea proceedings, and he presented the testimony of two of his friends, who stated that they saw him smoke crack cocaine the day before the murder. The attorney who represented Key at the plea proceeding testified that Key was lucid and did not appear to be under the influence of any substance on the morning the plea was taken. Moreover, during the plea colloquy, Key stated to Judge Monk that he was not under the influence of any intoxicating substance.
At the hearing on the motion for a new trial, Judge Monk questioned Key about the plea proceeding. Key acknowledged to the court that he had answered all of the court's questions at the proceeding and indicated that he could point to nothing in the transcript of the proceeding that supported his claim that he was under the influence of crack cocaine when he entered the plea. Key further admitted that, until *379 the day of the hearing on the motion for a new trial, he had not told anyone that he ingested crack cocaine at the courthouse. As the State notes in its brief to this Court, Key's failure to inform trial counsel of his alleged ingestion of cocaine on the day he entered the guilty plea substantially undermined Key's claim that counsel's failure to challenge the plea on that basis constituted deficient performance.
The trial court, having considered the testimony offered by the witnesses at the hearing on the motion for new trial, and having presided over the trial and the prior plea proceeding, was in a far better position than is this Court to judge the credibility of the witnesses. At the conclusion of the hearing, Judge Monk stated that Key demonstrated an obvious inability to testify truthfully or credibly. This Court will not substitute its judgment for that of the trial court in such circumstances. Key has demonstrated no basis upon which this Court should set aside the trial court's decision on this claim for relief.
3. Key's assertion that defense counsel rendered deficient performance because they did not challenge the prior stalking conviction as having been unsupported by any evidence is equally unavailing. Trial counsel testified at the hearing on the motion for a new trial that he obtained the file from the attorney who had represented Key on the 1998 charge, and he had reviewed the contents of the file. Although counsel stated that he believed the State had "kind of an iffy case," he further testified that he did not consider filing a motion to set aside the plea. (R. 1524.) Harmon Bayne Smith, who represented Key on the aggravated-stalking charge, testified at the posttrial hearing that there was no question in his mind, based on the evidence in his file, that Key would have been convicted of aggravated stalking if the case had gone to trial. Smith further testified that he did not believe there were any defects in the plea proceeding that would have resulted in the conviction's being vacated.
As with Key's claim that his plea to the aggravated stalking was invalid because he was under the influence of crack cocaine when he entered the plea, his claim regarding the lack of evidence to support the plea is belied by the record. The trial court did not err in denying relief on this claim, because Key failed to establish deficient performance or prejudice.
4. Key argues that trial counsel rendered deficient performance because they failed to challenge consideration of his 1985 assault conviction as an aggravating circumstance. He claims that counsel were aware of his mental disorders, and should have relied on that information to challenge the use of the conviction. The only evidence elicited at the posttrial hearing about this conviction was trial counsel's testimony that he asked Key about the conviction. Thus, Key has failed to demonstrate either deficient performance or prejudice. Nothing in the record would permit even speculation that the mental disorders Key allegedly suffered in 1985 precluded him from understanding the criminality of his acts such that the conviction was faulty.[5]
*380 Based on the foregoing, we find no support for Key's claims that trial counsel rendered deficient performance with regard to the aggravating circumstances, or that Key was prejudiced by the alleged deficiencies. Because Key failed to prove either prong of the ineffective-assistance test, the trial court correctly denied Key any relief on this claim.

E.
Key argues that trial counsel rendered ineffective assistance because they failed to object to the victim-impact statement at the sentencing phase of his trial. Key presented no evidence to support this claim. Moreover, a supplemental order issued by the trial court following a remand from this Court indicates that the reference at sentencing to a victim-impact report was to the report in the companion case involving Robbie Doyle, for which Key was sentenced on the same day. (S.R. 4-5.)[6] The judge stated in his final sentencing order on return to remand (see note 1, supra) that no victim-impact report was submitted in the case involving this victim. Therefore, Key's claim that trial counsel rendered deficient performance when they failed to object to the report is baseless. There could be no deficient performance or prejudice, because no victim-impact report regarding this victim was submitted at sentencing.

F.
In Issue XVIII of his brief to this Court, Key presents a "scattergun" argument. He claims that he was prejudiced due to ineffective assistance of counsel at the guilt and penalty phases of trial, then lists at least 15 allegations of ineffective assistance, with little or no legal or factual support along with the bare claims.[7] Many of the claims were addressed in other portions of Key's brief to this Court. We need not address each of the listed claims from this issue. We have, however, considered each claim listed, and are convinced that they do not support a finding that counsel rendered deficient performance, or that Key was prejudiced in any way by the actions or omissions he lists for our review.
In summary, we find no basis for disturbing the trial court's denial of Key's motion for a new trial. Our review of the record convinces us that the trial court's decision to deny the motion for a new trial is not due to be disturbed, because there is no evidence that the court abused its discretion. Indulging every reasonable presumption in favor of the correctness of the trial court's ruling, as we are bound to do, we find that the trial court's denial of Key's motion is due to be affirmed.

XI.
In Issue XV of his brief to this Court, Key argues that the trial court's jury instructions on the heinous, atrocious, or cruel aggravating circumstance were overbroad and arbitrary, vague and inadequate, and that they failed to explain to the jury how it was to compare his case to other capital cases. Key did not object to this instruction at trial, so this claim is now reviewed for plain error. We find no plain error in the trial court's instruction.
We have previously examined the issue Key raises here, and we have rejected it:

*381 "The trial court's charge complies with the [Ex parte] Kyzer [,399 So.2d 330 (Ala.1981),] standard. The trial court specifically informed the jury that this aggravating circumstance was limited to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." This standard has been consistently held to adequately narrow this circumstance as required by the Eighth Amendment. See Price v. State, [725 So.2d 1003 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999)]. We recognize that the instruction omitted the phrase `compared to other capital offenses.' However, when the instruction is viewed in its entirety, the instruction effectively narrowed this circumstance and informed the jury that it could find this aggravating circumstance to exist only if it concluded that the `capital offense was especially heinous, atrocious or cruel compared to other capital offenses.' Therefore, reversal is not warranted."
Broadnax v. State 825 So.2d 134, 210 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001).
Based on the foregoing, we conclude that the trial court's instruction to the jury on the § 13A-5-49(8), Ala.Code 1975, aggravating circumstance was proper. Because there was no plain error, Key is not entitled to relief on this claim.

Conclusion
Having reviewed the entire record and the arguments presented by the parties on appeal, we hereby affirm Key's conviction for the capital murder of his ex-wife, Debra. Our review of the sentencing hearings conducted in this case convinces us that no error occurred in those proceedings. However, we cannot complete our review of the case until such time as the circuit court files a sentencing order that contains "specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52." § 13A-5-47(d), Ala.Code 1975. Following the trial court's submission of the amended sentencing order, we will conduct our statutory review of the propriety of the death sentence. The trial court is ordered to submit its amended order within 42 days of the release of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, P.J., and SHAW, J., concur.
BASCHAB and WISE, JJ., concur in the result.
COBB, Judge (concurring specially).
I write separately to address a specific point of law related to Issue V of the majority opinion. Although the relevant caselaw mandates this Court's rejection of the claim Key raised in this issue, it appears to me that the application of the statute to this offense, and to similar ones, overreaches the intended scope of the statute. Section 13A-5-40(a)(17), Ala.Code 1975, was passed to address the increase in the numbers of crimes involving random or "drive-by" shootings. The statute was not intended to address circumstances such as those presented in this case, which was not a random act of violence. Because the Legislature has the authority to designate and define those crimes it deems to be capital offenses, I urge the Legislature to amend the statute so that crimes such as the one committed here would not be capital offenses or, at a minimum, the crimes *382 would not be subject to the imposition of the death sentence.

On Return to Remand
COBB, Judge.
On March 1, 2002, we affirmed Gary Frank Key's conviction for capital murder, and remanded the cause for the entry of a sentencing order that addressed each statutory aggravating circumstance, each statutory mitigating circumstance, and each nonstatutory mitigating circumstance and, if necessary, to reweigh the aggravating circumstances and the mitigating circumstances and to resentence Key. Key v. State, 891 So.2d 353, 381 (Ala.Crim.App.2002). The trial court has complied with our instructions.
On March 25, 2002, the trial court, on return to remand, submitted an amended sentencing order that satisfies the statutory requirements. In our opinion remanding the case to the trial court, we addressed all of the issues raised by Key regarding the guilt phase of his trial, and we reviewed the record of the guilt phase for plain error. We found no error, plain or otherwise, in the guilt phase of the proceedings and we affirmed Key's conviction for capital murder. In addition, we addressed in our original opinion all of the issues raised by Key regarding the sentencing phase of his trial, and we found no error. We pretermitted our statutory review of Key's death sentence. Now, having the trial court's amended sentencing order before us, we conduct our review of the death sentence.
As detailed in our original opinion in this case, the circumstances of this crime were exceptionally egregious. The day after Key was convicted of the aggravated stalking of his ex-wife, Debra, he, driving his own automobile, chased Debra and her friend in an automobile they were driving, ramming the car repeatedly until Debra lost control of the car and crashed the vehicle. While the women were trapped and terrified inside the car, Key shot Debra's friend once with an assault rifle, and he shot Debra repeatedly with the rifle. Key then drove away, leaving both women injured but conscious. Debra died hours later after undergoing surgery.
Section 13A-5-53, Ala.Code 1975, requires that, in addition to reviewing the case for any error involving Key's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Key of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating circumstances and the mitigating circumstances, after being properly instructed by the trial court, the jury, by a vote of 12-0, recommended a sentence of death. Thereafter, *383 the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would override the jury's recommendation and sentence Key to life imprisonment without the possibility of parole, or follow the jury's recommendation and sentence him to death. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its amended sentencing order, the trial court entered specific findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstances found to exist under § 13A-5-52, Ala.Code 1975.
In its amended sentencing order, the trial court found the existence of three statutory aggravating circumstances: (1) that Key committed the capital murder while he was under sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; (2) that Key had previously been convicted of a felony involving the use or the threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found no statutory mitigating circumstances to exist. § 13A-5-51, Ala.Code 1975. The trial court found nonstatutory mitigating circumstances to exist under § 13A-5-52, Ala.Code 1975:(1) Key's "mental, emotional and personality makeup," which included an untreated personality disorder or other mental or emotional disorder, his learning disability, his "psycho-social history," and a difficult family history; (2) the fact that Key had undergone psychological counseling for his behavioral, emotional, or mental disorders; (3) that Key had accepted responsibility for his conduct by pleading guilty; (4) the fact that a sentence of life imprisonment without parole would have prevented Key from being "in a position of re-offending."
The trial court's sentencing order, as amended, reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances it found to exist in the case, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Key to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.
Key was convicted of the murder of a person who he shot while she was in a vehicle. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(17), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App.2002), opinion on return to remand; McGriff v. State, [Ms. CR-97-0179, Sept. 29, 2000] ___ So.2d ___ (Ala.Crim.App.2000); Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.), cert. denied, 788 So.2d 915 (Ala.2000), cert. denied, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001).
After carefully reviewing the record of the guilt phase and the sentencing phase of Key's trial, we find no evidence indicating that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. *384 We have independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate sentence in this case. The evidence, which was discussed fully in our original opinion in this case, demonstrates the heinousness of this crime. Considering Key and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Based on the foregoing, Key's sentence of death is affirmed.
AFFIRMED.
McMILLAN, P.J., and SHAW and WISE, JJ., concur. BASCHAB J., adheres to original concurrence in result.
NOTES
[1] On September 1, 2000, this Court, by order, remanded this case to the circuit court for that court to file a written sentencing order with this Court. The trial court's final sentencing order was filed in this Court on October 31, 2000.
[2] Ted Kaczynski, nicknamed the "Unabomber," was convicted of placing 16 bombs that killed 3 victims and injured 9 more. U.S. v. Kaczynski, 239 F.3d 1108 (9th Cir.2001). He was the subject of much media attention, often appeared in photographs and on news broadcasts poorly groomed and with very disheveled clothing.
[3] The trial court informed the parties that M.T. was on probation and was the subject of review every two or three months to ensure that she paid her restitution, and defense counsel withdrew his exception to the strike of M.T. (R. 616.)
[4] At trial, Key also argued that certain photographs of the crime scene should be excluded. (R. 847-54.) He argues on appeal only that the autopsy photographs were improperly admitted, so we will address only those photographs.
[5] At the guilty plea hearing on the 1998 aggravated stalking conviction, the trial court inquired of Key about the 1985 assault conviction. Key replied, "It was [an] assault at a dice game that ended up in a fight and I cut a man. He shot me and I cut him and done time for it." (C. 242.) The trial court responded, "You're not supposed to carry a knife to a gun fight, apparently." Key replied, "Yes, sir. I learned very well." (C. 242.)
[6] (S.R. ___) refers to the supplemental record filed with this Court on August 21, 2000.
[7] This Court has held that presentation of claims in such a scattergun approach has been criticized and can result in a waiver of the right to review. E.g., Hamm v. State, [Ms. CR-99-0654, Feb. 1, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002).