891 So.2d 384 (2004)
Ex parte Gary Frank KEY.
(In re Gary Frank Key
v.
State of Alabama).
1020677.
Supreme Court of Alabama.
March 5, 2004.
*385 Warren Freeman, Delta, for petitioner.
William H. Pryor, Jr., atty. gen.; Nathan A. Forrester, deputy atty. gen.; and Tracy Daniel, asst. atty. gen., for respondent.
LYONS, Justice.
Gary Frank Key was convicted in October 1999 of murder made capital because he shot and fatally wounded the victim, his ex-wife, while she was a passenger in a vehicle. § 13A-5-40(a)(17), Ala.Code 1975. The jury, by vote of 12-0, recommended that Key be sentenced to death. After conducting its own sentencing hearing, the trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Key to death.
Key then appealed to the Court of Criminal Appeals. The Court of Criminal Appeals affirmed as to the conviction and remanded the case with directions to the trial court to correct deficiencies in its sentencing order. Key v. State, 891 So.2d 353 (Ala.Crim.App.2002). On remand, the trial court stated that it found three statutory aggravating circumstances to exist. One of those aggravating circumstances was that the "capital offense was especially heinous, atrocious or cruel compared to other capital offenses." See § 13A-5-49(8), Ala.Code 1975. Based upon the amended sentencing order of the trial court, the Court of Criminal Appeals, on return to remand, affirmed Key's sentence. Key v. State, 891 So.2d 353, 382 (Ala.Crim.App.2002). This Court granted certiorari review only as to the trial court's finding of the existence of the aggravating circumstance that the murder was "especially heinous, atrocious or cruel" when compared to other capital offenses.
The Court of Criminal Appeals stated the facts of this case as follows:
"After a 13-year marriage, Gary Key and Debra Key divorced on September 22, 1997. Debra continued to experience problems with Key, and she filed stalking charges against him. On January 16, 1998, Key was indicted for aggravated stalking. On July 30, 1998, Key negotiated *386 a guilty plea to the aggravated-stalking charge, and he was sentenced to a 10-year term of imprisonment. He applied for probation, which the State did not oppose, and the court set a probation hearing for September 1998.
"At approximately 6:15 p.m. on July 31, 1998, the day after Key pleaded guilty to aggravated stalking, Debra and her best friend, Robbie Doyle, were in Doyle's automobile. They stopped for a moment in a parking lot, and Doyle noticed that an automobile pulled up next to hers. Doyle told Debra that Key was next to them, and Debra said, `Run.' Doyle drove away from Key's vehicle and into a service station parking lot. As she drove through the parking lot, she screamed to bystanders, `Call the law. He's going to kill us.' Key pursued them in his car, and he rammed his car into Doyle's as she left the service station. Doyle sped away, but was forced to slow down because of traffic conditions. Key rammed her car twice more. Doyle lost control of her vehicle, which spun around and landed in a ditch.
"As a result of the accident, Debra was thrown to the floor on the passenger side of the car. She was searching for a pistol that she carried with her, but was unable to find it. Doyle realized that Key was at the driver's side door, holding a long gun. Doyle told Debra to continue searching for the gun while she attempted to talk with Key. Key ordered Doyle to tell Debra to get out of the car, and Doyle explained to him that Debra's car door was against the ditch and that her own car door was up in the air, so she asked Key to help them get out of the car. A woman passing the scene stopped her car and she heard Key screaming at the women to get out of the car. When Key saw the passerby, he told her to go on, and the woman left. Key twice more told Debra to get out of the car, then he fired a shot that struck Doyle in the left breast. Doyle slumped to the side, facing Debra, who was still on the floorboard of the car. Doyle said she heard five or six shots and saw Debra's body jump as it was struck by the gunshots. As the women screamed, Key walked away from them, got into his car, and drove away. Forensic tests later revealed that Key had fired an SKS assault rifle into the car. Doyle next heard a woman outside the car asking if they needed an ambulance, and the woman left to summon emergency technicians. Doyle said that she and Debra reached out and interlocked their little fingers. Debra said, `I can't breathe. I'm going to die.' Debra was conscious when emergency workers arrived, and she told a paramedic that her ex-husband had run her and her best friend off the road and had shot them. Debra sustained gunshot wounds to her face, upper chest and abdomen. Her liver and spleen were shattered, her colon was damaged, she had a hole in her diaphragm. She underwent two or three hours of surgery, and died soon after surgery.
"Key was apprehended the next day. Officers did not detect the odor of alcohol about Key, and Key did not exhibit any problems communicating with the officers. In his statement to the police, Key denied any involvement in the shooting. Key acknowledged that he had been in court on the stalking charge and said that he had been recommended for probation. He denied ingesting alcohol or other drugs on the day Debra was shot, and he claimed that he had not ingested drugs in more than a year.
"At the penalty phase of the trial, Dr. Warner, the medical examiner who performed the autopsy on Debra's body, *387 testified that he observed five gunshot wounds. One bullet entered Debra's left cheek, exited the left side of her chin, then reentered her left upper chest and traveled through her breast, and exited the body. Dr. Warner testified that this bullet would not have caused Debra's death, but as it `burn[ed] along the wound pathway, tear[ing] up the skin,' it would have been very painful. Dr. Warner testified that another bullet passed through Debra's left breast, then grazed her abdomen. That wound would not have been fatal, but would have been very painful due to the sensitivity of the breast. A third bullet penetrated Debra's right breast and exited her body. The fourth bullet wound Dr. Warner identified began in the lower chest, passed through the thoracic and abdominal cavities, and exited at the left hip. According to Dr. Warner, the path of the final bullet penetrated the left upper abdomen, traveled through the internal viscera, and exited at the left hip. Dr. Warner testified that the fourth and fifth wounds he identified caused extensive damage to Debra's heart, liver, spleen, and intestines, and were the fatal wounds. He further stated that wounds to the liver are `exquisitely painful.' The pain associated with damage to the lungs, intestines, and heart would have been painful. Dr. Warner stated that Debra was rapidly incapacitated but that she suffered a slow death.
"One of the paramedics who transported Debra from the scene testified that she was conscious until she was anesthetized for surgery. Debra told him she was in pain and that she could not breathe. The paramedic testified, `She had approximately a softball sized hole in her left upper chest . . . [and] it wasn't surprising that she couldn't breathe.' Debra asked the paramedic if she was going to die and repeatedly said she saw angels around her.
"At the penalty phase of the trial, Key presented testimony from his brother, who stated that their father was abusive and that Key had had a bad temper when he was younger. He said that Key suffered a broken neck when he was approximately six or seven years old, and that he suffered from headaches thereafter. Key's brother testified that Key became angry when Debra left him, and he heard Key say that if he could not have Debra, no one could have her. He also said he was going to kill Debra.
"Dr. John Goff, a psychologist, testified on Key's behalf. He stated that Key suffered from a borderline personality disorder. Goff's evaluation of Key indicated to him that Key had a delusion that Debra was having a homosexual affair, and that the affair prevented Debra's reconciliation with him. He said that Key apparently became enraged over his perception of the circumstances and was probably not in control `from a psychological standpoint' when he shot Debra. Dr. Goff testified that it was not relevant to his diagnosis that one day before the murder Key pleaded guilty to stalking Debra or that Key had lied to the police when he was apprehended. Key told Dr. Goff that he had abused cocaine and alcohol in the days before the murder and that he remembered firing the first shot into Doyle's car. The prosecutor asked Dr. Goff about a document Key filed in September 1999 in a court proceeding involving a civil matter in which Key denied using drugs or alcohol before the incident and in which he said Robbie Doyle caused the crash. Dr. Goff testified that Key's statements in that document were irrelevant to his diagnosis. Joann Terrell, a licensed clinical social worker, testified about the psychosocial assessment she *388 conducted of Key. She testified that she interviewed Key and several members of his family and that she reviewed Key's school and psychological records. Terrell testified that Key exhibited disruptive behavior as a child and that he suffered physical and emotional abuse in his home. She said that Key was impulsive and self-destructive and that he experienced uncontrolled rage. Terrell said Debra was the only person who took an interest in Key and that when she left him, he wanted her back and began stalking her. Terrell said that Key's guilty plea to aggravated stalking the day before the murder was not relevant to her evaluation of Key. The prosecutor read into the record a letter Key had written to his daughter while he was awaiting trial for this capital murder. The letter stated:
"`"For two years I tried to tell your mother not to put me in jail but someone kept getting her to. On July 30th they give [sic] me ten years [on the aggravated-stalking conviction] and I just can't do it. So I lost you and your mother and my life, too."'
"Terrell said that the letter did not indicate to her that the guilty plea and 10 year sentence were motives for the murder. She stated that the murder was the result of `a horrible chance encounter' and impulsive acting out. Key told Terrell that he did not intend to shoot Robbie Doyle and that he meant only to shoot out the car window when he shot Doyle.
"The prosecutor presented the testimony of the clerk of the Calhoun Circuit Court to show that, on July 30, 1998, Key entered into a plea agreement in the aggravated-stalking case, was sentenced to 10 years' imprisonment, and applied for probation. The plea-agreement form included a notation regarding a 1985 conviction for first-degree assault.
"At the conclusion of the sentencing hearing, the jury deliberated for less than two hours before returning a unanimous recommendation that Key be sentenced to death.
"The trial court held a separate sentencing hearing to consider the aggravating circumstances and the mitigating circumstances and to impose sentence on Key. No additional testimony was offered at the hearing. When given the opportunity to speak on his behalf, Key told the court that he wanted Debra's entire family to know that he was sorry for what he had put them through but that he did love Debra. He said, `I didn't kill her out of hate.' The trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Key to death. The trial court subsequently issued a written sentencing order and discussed the evidence offered by the parties as aggravating and mitigating circumstances.
"Key obtained new counsel and filed a motion for a new trial. On April 12, 2000, the court held a hearing on the motion. The court heard testimony from Key, one of his trial attorneys in the capital case, two of Key's friends, and the attorney who represented Key in the 1998 aggravated-stalking case. After considering the testimony, the court denied the motion for a new trial."
891 So.2d at 359-62 (citations to record and footnote omitted).

I. Analysis

A. Was the Jury Instruction Adequate?
Key first argues that the trial court erred in its instruction to the jury on the aggravating circumstance that the offense *389 was "especially heinous, atrocious or cruel."
Key argues in his brief to this Court that the instruction regarding that aggravating offense was vague and inadequate because the jury "was not given any comparison or comparative criteria from which to come to a lawful conclusion." More specifically, he contends that the trial court should have provided the jury with facts from other capital cases to compare to his case in evaluating whether the aggravating circumstance that the offense was "especially heinous, atrocious or cruel" existed. The lack of adequate instruction by the trial court, Key contends, falls short of the mandate of Ex parte Kyzer, 399 So.2d 330 (Ala.1981), in which this Court held that a homicide must be "unnecessarily torturous" to the victim for the aggravating circumstance that the offense was "especially heinous, atrocious or cruel" to exist.
This Court has previously addressed the argument Key makes here. In Ex parte Bankhead, 585 So.2d 112 (Ala.1991), this Court, relying on Kyzer, held that the trial court was not required to inform the jury of other capital offenses where the death penalty was based on a finding of the existence of the aggravating circumstance in § 13A-5-49(8). In Bankhead, this Court stated:
"Although a very narrow and literal reading of [§ 13A-5-49(8)] may suggest that such a comparison [between the capital offense at issue and other capital offenses] is required, it would be virtually impossible for the court to implement. Charging the jury on pertinent facts of `other capital cases' would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury.
"This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was `especially heinous, atrocious or cruel,' the court uses the [Ex parte] Kyzer [, 399 So.2d 330 (Ala.1981),] standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334."
585 So.2d at 125. Because the trial court instructed the jury on the Kyzer standard, we hold that the failure of the trial court to provide comparative criteria of other capital offenses in its instruction to the jury did not amount to error.

B. Was the Murder Unnecessarily Torturous to the Victim?
Key also argues that the aggravating factor that the offense was "especially heinous, atrocious or cruel" should not have been applied to his case at all because, he says, the murder was not "unnecessarily torturous" to the victim, especially when compared to other capital offenses. See Kyzer.
The trial court considered the following facts in its amended sentencing order to support its finding that the aggravating circumstance in § 13A-5-49(8) existed in this case:
"[Key] had a history of violence directed toward many people, including his family, and the capital victim herein. The Victim was well aware of this history and [Key's] ability and willingness to carry out any act of violence, including the serious bodily injury on another. On the date of the incident made the basis of this case, . . . he was manifesting acts and gestures indicating his intent to threaten, intimidate, and terrorize the victims, particularly Debra Key. As the encounter escalated, the Victim *390 was well aware of the apparent intent of [Key] to kill her or to inflict bodily injury. She was forced to endure this appreciation throughout their attempt to elude him, while he was running his car up against the vehicle in which Ms. Key was riding, and, finally, after the Victims' vehicle had been forcibly run off the road and into a ditch, while both Ms. Key and her friend Ms. Doyle were trapped helplessly in that vehicle like animals in a trap, [Key], while continuing to manifest his intentions, walked to this wrecked vehicle with a weapon and proceeded to shoot Ms. Doyle, and then shoot, at least (5) five times, Ms. Key."
In reviewing whether a murder is "especially heinous, atrocious or cruel," this Court has consistently considered several factors.

1. Psychological Torture
One factor this Court has considered particularly indicative that a murder is "especially heinous, atrocious or cruel" is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture "must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering." Norris v. State, 793 So.2d 847, 861 (Ala.Crim.App.1999).
In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the defendant stalked a convenience-store clerk for several days before he walked into the store and shot her during a robbery. There was evidence that the clerk had been aware of his presence and that she was afraid of him. This Court held that the murder was "especially heinous, atrocious or cruel" given, among other things, that the murder was perpetrated under circumstances that caused fear and pain to the victim before death. The Court specifically stated that "evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989). . . ." 663 So.2d at 1003.
This case is very similar to Rieber in that both the store clerk in that case and the victim in this case were afraid of their attackers and feared for their lives before their death. Key had been convicted of stalking the victim, and during the car chase and while she was in the car in the ditch she was aware of Key's propensity for violence and his intent to kill her or to inflict great bodily injury on her. The victim was forced to suffer psychological torture from the moment she saw Key pulling his vehicle up next to Robbie Doyle's car, throughout the car chase, during the time she was trapped in the car with no means of escape, while Key repeatedly shot her, and up until she was anesthetized for surgery. While this Court cannot be certain of the exact amount of time that elapsed during the course of those events, the victim here suffered psychological torture for a greater period of time than did the victim in Rieber.
Thus, we hold that the evidence supports the finding that the victim suffered psychological torture for an appreciable period.

2. Suffering After the Assault
Another factor to be considered in determining whether the aggravating circumstance that the murder was "especially heinous, atrocious or cruel" has been proven beyond a reasonable doubt is whether the victim experienced appreciable suffering after a swift assault that ultimately resulted in the victim's death. In order to prove this factor, the evidence *391 must also show that the victim was conscious after the initial assault and suffered for an appreciable length for time.
We addressed this factor in Ex parte Clark, 728 So.2d 1126 (Ala.1998). In Clark, although the victim sustained five shots to the head and back, and a final sixth shot to the ear, the record did not indicate that the victim was conscious and aware after the initial shots were fired. This Court held that it could not expand the aggravating circumstance set out in § 13A-5-49(8) to include murders such as the one in Clark, where the record did not reflect that the victim had suffered after the initial assault.
In the present case, the evidence indicates that Key showed no remorse for his actions; even after the frightening car chase and repeated shooting of the victim, he left the victim to die, without seeking medical attention for her. Although the victim later received medical treatment, the medical expert in the case testified that the victim suffered "exquisite pain" and was forced to endure this pain along with a "profound sensation of drowning" the entire time she remained conscious. According to the medical expert, the victim "suffered a slow death." There was also testimony indicating that when the victim arrived at the hospital she was having trouble breathing and was in a great deal of pain. Furthermore, one of the paramedics who transported the victim from the scene testified that she was conscious until she was anesthetized for surgery.
This Court has stated that such execution-type slayings, evidencing a cold, calculated design to kill, fall into the category of murders that are "especially heinous, atrocious or cruel." See Wright v. State, 494 So.2d 726, 744 (Ala.Crim.App.1985), aff'd, 494 So.2d 745 (Ala.1986) (trial court found that the two victims were murdered "`in order that they would not be witnesses'" and that they "`were each shot in the head, [and] slowly died in a pool of blood'"). Thus, the evidence supports the trial court's finding that the victim experienced appreciable suffering after a swift assault that resulted in her death.

II. Conclusion
While the fact that the victim was shot five times is atrocious, the fact that the victim endured psychological torture before she died and appreciable suffering after she was shot and before she died separates this crime from an ordinary murder. As the trial court stated in its sentencing order, "had the [victim] died or been forced into unconsciousness immediately and not been forced to endure the terroristic threats of the defendant, this circumstance would be more difficult to have found to exist." However, the particular facts of the case clearly establish beyond a reasonable doubt that this crime was "unnecessarily torturous" to the victim and that it was therefore "especially heinous, atrocious or cruel." Also, as previously discussed, because the trial court instructed the jury on the Kyzer standard, the trial court correctly instructed the jury on this aggravating circumstance. Therefore, the Court of Criminal Appeals did not err in affirming Key's sentence on return to remand, and we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., dissents.
JOHNSTONE, Justice (dissenting).
I concurred in the decision of this Court to deny certiorari review of any of the holdings by the Court of Criminal Appeals necessary to its affirmance of the defendant's *392 adjudication of guilt. I likewise concurred in the decision of this Court to grant certiorari review only on the issue of whether the trial court properly applied the § 13A-5-49(8), Ala.Code 1975, heinous-atrocious-cruel aggravating circumstance in order to sentence the defendant to death. On this one issue addressed by the main opinion, I respectfully dissent.
"A capital sentencing scheme must, in short, provide a `"meaningful basis for distinguishing the few cases in which [the [death] penalty] is imposed from the many cases in which it is not."' [Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976),] quoting Furman v. Georgia, [408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972),] (White, J., concurring).
"That means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates `standardless [sentencing] discretion.' Gregg v. Georgia, supra, at 196, n. 47, 96 S.Ct. 2909. See also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 [(1976)]; Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [(1976)]. It must channel the sentencer's discretion by `clear and objective standards' that provide `specific and detailed guidance,' and that `make rationally reviewable the process for imposing a sentence of death.'"
Godfrey v. Georgia, 446 U.S. 420, 427-28, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (footnotes omitted, some alterations original, one new). The main opinion in the case now before us demonstrates the worsening failure of Alabama caselaw defining and applying the heinous-atrocious-cruel aggravating circumstance to meet the requirements of Godfrey. The definition and criteria for this aggravating circumstance, as identified and applied by the main opinion, will not foreclose the heinous-atrocious-cruel aggravating circumstance with any predictable consistency unless the murderer catches the victim instantly, kills the victim quickly, painlessly, and neatly, and gets the (dead) victim to the doctor promptly.
Articulating a definition and criteria for this aggravating circumstance that will consistently meet the requirements of Godfrey is admittedly difficult. The Alabama definition, "conscienceless or pitiless homicides which are unnecessarily torturous to the victim," Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), confronts the courts with the absurd task of articulating the proper way to commit a murder. In an effort to discriminate between the murders which support this aggravating circumstance and the murders which do not, the main opinion and our precedents, in effect, adopt the criteria of how mentally painful, how physically painful, how gory, and how long. While all of these criteria are matters of degree, the main opinion and our precedents do not, and as a practical, social, and political matter cannot, quantify the maximum degrees that still will not warrant a finding of this aggravating circumstance. Without such quantification, the courts can find or hold the facts of most murders to fulfill some or all of these criteria and thereby to warrant a finding of this aggravating circumstance. Therefore, each of these cases is being decided subjectively, contrary to Godfrey, supra, and usually adversely to the defendant, because of the horror, heartbreak, and outrage of nearly every murder.
This aspect of our "capital sentencing scheme" does not "provide a meaningful *393 basis for distinguishing the few cases in which the [death] penalty is imposed from the many cases in which it is not." Godfrey, supra, at 427-28, 100 S.Ct. 1759 (internal quotation marks and original brackets omitted). Indeed, for heinous-atrocious-cruel-claim cases in Alabama, the numbers are the other way around. Contrary to Godfrey, the main opinion and other Alabama caselaw do not "make rationally reviewable the process for imposing a sentence of death," id., on the basis of this aggravating circumstance.
I respectfully submit that the only way for the courts of this state consistently to meet the requirements of Godfrey will be for this Court to revise the judicial definition of this aggravating circumstance to include only murders accompanied by intentional torture. Because the murder in the case now before us does not meet this definition, I respectfully submit that this case should be reversed and remanded with instructions that the death sentence be vacated and that the defendant be resentenced to life imprisonment without the possibility of parole.