[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 868 
The appellant, Michael D. Carruth, was convicted of four counts of capital murder in connection with the murder of 12-year-old William Brett Bowyer ("Brett"). The murder was made capital (1) because it was committed during the course of a kidnapping in the first degree, see § 13A-5-40(a)(1), Ala. Code 1975; (2) because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), *Page 869 
Ala. Code 1975; (3) because it was committed during the course of a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code 1975; and (4) because Brett was less than 14 years of age, see §13A-5-40(a)(15), Ala. Code 1975. Carruth was also convicted of attempted murder, a violation of §§ 13A-6-2 and 13A-4-2, Ala. Code 1975, robbery in the first degree, a violation of §13A-8-41, Ala. Code 1975, and burglary in the first degree, a violation of § 13A-7-5, Ala. Code 1975, with respect to Brett's father, Forest F. Bowyer ("Bowyer"). The jury unanimously recommended that Carruth be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Carruth to death. In addition, the trial court sentenced Carruth to life imprisonment for the attempted-murder, robbery, and burglary convictions.
In its sentencing order, the trial court made the following findings of fact, which are supported by the evidence, regarding the crimes:
 "[I]n the evening and early morning hours of February 17 and February 18, 2002, the defendant, Michael David Carruth, and another person identified as Jimmy Lee Brooks, Jr.,[1] entered the home of Forest F. (Butch) Bowyer and his son William Brett Bowyer, while the home was occupied by both Forest F. (Butch) Bowyer and his son William Brett Bowyer. William Brett Bowyer was twelve (12) years of age.
 "[Carruth] and [Brooks] entered the Bowyer home under the guise of being narcotics officers. The Bowyers were handcuffed and taken to a remote road construction site in rural Russell County, the vicinity of the ultimate murder site, where the elder Bowyer was questioned concerning a safe [that, based on Brooks's former employment with Bowyer, Carruth and Brooks believed Bowyer had containing $100,000]. The mode of transportation was a white Ford Crown Victoria that had a security shield between the front and back seats.
 "The Bowyers were taken back to their home in order for Forest F. (Butch) Bowyer to get money for [Carruth] and [Brooks]. While there, [Carruth] slapped the elder Bowyer. [Brooks] found money[, approximately $47,000] and a .38 caliber Smith and Wesson revolver.
 "[Carruth] and [Brooks] transported the Bowyers back to the road construction site, this time to the murder site. [Carruth] walked Forest F. (Butch) Bowyer away from the car and cut him on the [right side of his] neck [and he said, `that's sharp, isn't it?'] [Carruth] shortly thereafter cut Forest F. (Butch) Bowyer's throat. [Brooks] also cut Bowyer's throat. [Carruth] then sat on Forest F. (Butch) Bowyer and told him to `go to sleep.' It was during this period of time that the child, William Brett Bowyer, asked [Carruth] and [Brooks] not to hurt his daddy. The response to the child from [Brooks] was that he needed to be concerned about himself, not his dad.
 "The defendant, Michael David Carruth, told [Brooks] `I've done one, now you do one.' At this point, [Brooks] shot the child in the head. When a gurgling sound came from the child, [Brooks] commented `the little M.F. doesn't want to die' and shot him two (2) more times in the head. The child, William Brett Bowyer, fell into a shallow grave [that *Page 870 
Carruth and Brooks had dug earlier]. The father, Forest F. (Butch) Bowyer, was thrown on top of the child. [Carruth] and [Brooks] laughed and joked as they threw dirt on the dead child and his father, covering them in the shallow grave."
(C. 704-06.) After Carruth and Brooks left the scene, Bowyer dug himself out of the grave and flagged down a passing motorist for assistance. He later identified both Carruth and Brooks as the perpetrators of the crimes.
 I.
Carruth contends that the trial judge, Albert L. Johnson, erred in not recusing himself from presiding over Carruth's trial because, he says, Judge Johnson exhibited personal bias toward him when ruling against Tri-County Bonding Company ("Tri-County"), a company for which Carruth worked, in two bond-forfeiture cases. According to Carruth, Judge Johnson's demeanor and conduct in the forfeiture cases, as well as some off-the-record comments Carruth says Judge Johnson made to him at another time, would lead a reasonable person to question whether Judge Johnson harbored a personal bias against him or lacked impartiality.
In his motion for recusal, Carruth alleged that Judge Johnson had presided over two bond-forfeiture hearings involving Tri-County — one involving Mack Devon Knight and the other involving Keith Allen Butts — and that Judge Johnson improperly forfeited both bonds and told Carruth, who was representing Tri-County at the hearings, that Tri-County would be out of business until the money was paid. Carruth also alleged that Judge Johnson treated another bonding company, Weeks Bonding Company ("Weeks"), differently than he treated Tri-County; specifically, he alleged that Judge Johnson allowed Weeks "to turn a defendant into the Sheriff's custody ninety (90) days after the bond forfeiture was finalized," commended Weeks for returning the defendant to court, and "never ordered Weeks Bonding Company out of business until the money was paid." (C. 100.)
Carruth was the only witness to testify at the evidentiary hearing on the recusal motion; he also introduced several documents relating to the bond-forfeiture hearings involving Knight and Butts. The evidence at the hearing indicated that in October 1999 conditional forfeitures were entered against Tri-County when Knight and Butts failed to appear in court. Tri-County filed answers to the conditional forfeitures in November 1999 — Carruth had prepared both answers. In the Knight case, Tri-County alleged in its answer that Knight was incarcerated in Georgia and that a detainer had been lodged against him by the Russell County Sheriff's Department; attached to the answer was a letter to Tri-County from Ruth Hollins, an employee of the Russell County Sheriff's Department, stating that Knight was currently in the Muscogee County jail in Georgia and that Russell County would be notified upon his release. In the Butts case, Tri-County alleged that it had been unable to find Butts. Judge Johnson scheduled bond-forfeiture hearings for both cases for March 7, 2000.
Carruth appeared as a representative of Tri-County at those bond-forfeiture hearings. At the forfeiture hearing for Knight, Carruth told Judge Johnson that Knight was then incarcerated at Hayes State prison in Georgia, but he presented no documentation from the State of Georgia verifying that fact. In response, Judge Johnson stated: "Well, like I just . . . told Weeks Bonding, by closing today I'm going to have something in this file *Page 871 
saying what you're telling me . . . or by nine o'clock in the morning I'm going to have $5,000 or you're not going to be operating at 9:01. . . . Simple as that." (C. 2595.) At the forfeiture hearing for Butts, Carruth told Judge Johnson that Tri-County had been looking for Butts but had been unable to find him. In response, Judge Johnson stated "I want $7,500 by noon today, or I'll issue an order to stop you from operating." (C. 2614.) Judge Johnson issued final bond forfeitures against Tri-County in both cases following the hearings on March 7, 2000. Tri-County paid both bonds on March 31, 2000. On April 17, 2000, Carruth located Butts and returned him to jail; no further action was taken in that case to get the forfeiture set aside. However, Tri-County, through its attorney, filed a motion to set aside the forfeiture in the Knight case, and a hearing was held on that motion on June 20, 2000. At the hearing, Carruth again appeared as a representative of Tri-County and told Judge Johnson that Knight was still in prison in Georgia; the prosecutor confirmed that Knight was in prison in Georgia. Judge Johnson then stated:
 "All right. I'm going to again show that, let the record reflect, that I have nothing in the file to indicate from any law enforcement agency in the State of Georgia saying that he's incarcerated, and I think that prudence would require me to have that. But because you filed an answer and the State has verified that Mr. Knight is, indeed, in the State of Georgia, I'm going to set the forfeiture aside at this time.
 "But I'm telling you, from this point forward, if I do not have the affidavits, then I'm not going to set them aside."
(C. 2603-04.) At this point in the hearing, Carruth stated that he had a copy of a certification from the State of Georgia regarding Knight's incarceration and that he would bring a copy to the court. The clerk then informed Judge Johnson that a copy of the certification was in another file. The case action summary from the Knight case indicates that a copy of the certification from the State of Georgia regarding Knight's incarceration had been faxed to the court on March 9, 2000, two days after the first bond-forfeiture hearing. On June 28, 2000, Judge Johnson issued an order setting aside the forfeiture in the Knight case and ordering that Tri-County be reimbursed.
At the recusal hearing, Carruth testified on direct examination that he believed Judge Johnson was biased against him based on statements he said Judge Johnson had made to him off-the-record and based on Judge Johnson's demeanor at the bond-forfeiture hearings. Carruth testified that one time when he applied for recertification for Tri-County, Judge Johnson said "the best news that you're going to have this year is that I'm no longer in charge of criminal matters, that I'm on the civil side" and that "I may be a son-of-a-bitch, but I'm an equal opportunity son-of-a-bitch." (R. 174.) Carruth stated that Judge Johnson was "in a good mood" and was "polite" when he made these statements. (R. 173.) Judge Johnson stated at the hearing on Carruth's recusal motion that he did not specifically recall making these statements to Carruth, but that he had, in the past, said that he "was an equal opportunity S.O.B." (R. 201.) Carruth also testified that Judge Johnson appeared "unhappy" and even angry at him during the bond-forfeiture hearings. (R. 168.) According to Carruth, "If I spoke to him like he spoke to me, I'd be in contempt of court." (R. 149.) Carruth further testified that Judge Johnson treated Tri-County differently than he treated other bonding companies. He said that Weeks brought in a defendant 60 to 90 days after the final forfeiture had been *Page 872 
issued and that Judge Johnson set aside the forfeiture and commended Weeks for its work in returning the defendant. Carruth testified that he never heard Judge Johnson threaten to shut down Weeks, as he did Tri-County, if it did not pay the bond, and he specifically testified that he was present during a forfeiture hearing involving Weeks on March 7, 2000, and that Judge Johnson was "very cordial" to Cynthia Weeks (R. 175) and that he heard "nothing but admiration" from Judge Johnson regarding Weeks (R. 173) at that time. However, on cross-examination, Carruth admitted that Judge Johnson entered final forfeitures against all bonding companies "equally" (R. 187); that he heard Judge Johnson tell Weeks on March 7, 2000, that documentation was necessary just as he had told Tri-County; and that he was aware, long before the forfeiture hearing involving Knight, that documentation from the authorities holding a defendant in another jurisdiction was required to avoid forfeiture.
After Carruth's testimony, Judge Johnson, without objection, introduced as a court exhibit a transcript of a bond-forfeiture hearing he presided over involving Weeks. In doing so, he stated:
 "All right. We're going to mark the exhibit as CC-99-15, and let me say this was done today. When this motion was filed, I began to prepare the record, so to speak, to make sure that everyone was given ample opportunity to see what actually transpired on the date complained of. And when there are allegations of bias, I think the court has an obligation to get to the bottom of it, and, indeed, to determine if there has been instance[s] of bias.
 "The foundation of our judicial system is that all parties receive a fair and just trial. And even perceived bias, whether it's intended or not, I think many times can jeopardize that. But to be perceived bias, there must be some rational, must be a reasonable perception, and I would think that's what the caselaw would show, that there must be a reasonable perception. And I wanted to get a copy of the other hearing concerning Weeks Bonding Company, and I think the parties have just read that, and I'm going to label this as court's exhibit 1 and introduce it into evidence.
 "And I do want to read the last paragraph. This is from `THE COURT: Okay. Well, like I said, that's why we're having this hearing, so we can get it straight. And if they can have it to the clerk by closing today, then I'm going to set it aside.' We were referring, I think, to a preliminary forfeiture. `We will hear these matters — this case number CC-99-14 and 99-15. These matters are set to determine why final forfeiture should not be entered.' A preliminary had been entered at that time but no final. If they can — and then we'll go back. `If they can have it to the clerk by closing today, then I'm going to set it aside. That being the preliminary forfeiture. If the clerk's office doesn't have it today, then I [expect] then — what is it, we're going to do one of two things. By the end of closing today I'm going to set it aside or nine o'clock in the morning I want $30,000. One of those things is going to happen. All right. Thank you.'"
(R. 193-95.)[2] After hearing arguments from the parties, Judge Johnson then denied *Page 873 
the motion for recusal.[3]
"All judges are presumed to be impartial and unbiased,"Woodall v. State, 730 So.2d 627, 638 (Ala.Crim.App. 1997), aff'd in pertinent part, rev'd on other grounds, 730 So.2d 652
(Ala. 1998), and "[t]he burden i[s] on the party making a motion to recuse to establish that the trial judge is biased or prejudiced against the defendant." Stallworth v. State,868 So.2d 1128, 1140 (Ala.Crim.App. 2001). Canon 3.C.(1), Alabama Canons of Judicial Ethics, provides, in pertinent part:
"C. Disqualification.
 "(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
 "(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."
In Ex parte Duncan, 638 So.2d 1332 (Ala. 1994), the Alabama Supreme Court explained:
 "Under Canon 3(C)(1), Alabama Canons of Judicial Ethics, recusal is required when `facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge.' Acromag-Viking v. Blalock, 420 So.2d 60, 61 (Ala. 1982). Specifically, the Canon 3(C) test is: `Would a person of ordinary prudence in the judge's position knowing all of the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?' Matter of Sheffield, 465 So.2d 350, 356 (Ala. 1984). The question is not whether the judge was impartial in fact, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality — whether there is an appearance of impropriety. Id.;
see Ex parte Balogun, 516 So.2d 606 (Ala. 1987); see, also, Hall v. Small Business Administration, 695 F.2d 175 (5th Cir. 1983)."
638 So.2d at 1334.
"The standard for recusal is an objective one: whether a reasonable person knowing everything that the judge knows would have a `reasonable basis for questioning the judge's impartiality.' [Ex parte] Cotton, 638 So.2d [870] at 872 [(Ala. 1994)]. The focus of our inquiry, therefore, is not whether a particular judge is or is not biased toward the petitioner; the focus is instead on whether a reasonable person would perceive potential bias or a lack of impartiality on the part of the judge in question. In In re Sheffield, 465 So.2d 350, 357 (Ala. 1984), this Court wrote:
 "`[T]he reasonable person/appearance of impropriety test, as now articulated in Canon 3(C)(1), in the words of the Supreme Court of the United States, may "sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). As stated in Canon 1 of the Code of Judicial Ethics, "An independent and honorable judiciary is indispensable to justice in our society," and this requires avoiding all appearance of impropriety, even to the point of resolving all reasonable doubt in favor of recusal.' *Page 874 
 "(Some emphasis original; some emphasis added [in Bryant].)."
Ex parte Bryant, 682 So.2d 39, 41 (Ala. 1996).
"Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source." Exparte Melof, 553 So.2d 554, 557 (Ala. 1989), abrogated on other grounds, Ex parte Crawford, 686 So.2d 196 (Ala. 1996).
 "`"The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."'"
Ex parte Duncan, 638 So.2d at 1334, quoting Ex parte Large,501 So.2d 1208, 1210 (Ala. 1986), quoting in turn United Statesv. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698,16 L.Ed.2d 778 (1966). As this Court explained in Woodall, supra, in upholding the trial court's denial of a motion to recuse on the ground that the trial court had previously entered a civil judgment against the defendant:
 "To disqualify a judge because of bias, the bias must be personal bias. Ex parte Large, 501 So.2d 1208, 1210-11 (Ala. 1986).
 "`The bias or prejudice which has to be shown before a judge is disqualified must be "personal" bias, and not "judicial" bias. Personal bias, as contrasted with judicial, is an attitude of extra-judicial origin, or one derived non coram judice. In re White, 53 Ala.App. 377, 300 So.2d 420 (1974). The fact that one of the parties before the court is known to and thought well of by the judge is not sufficient to show bias. Duncan v. Sherrill, 341 So.2d 946 (Ala. 1977). Neither is the fact that the judge had previously sentenced the defendant's partner in crime to the maximum sentence and bemoaned the fact that he could not impose a longer sentence sufficient to constitute proof of bias. Coleman v. State, 57 Ala.App. 75, 326 So.2d 140 (1976). Nor is bias proved simply because the trial judge who presided at the second trial of defendant had also presided at his first trial and heard evidence later found to be inadmissible by an appellate court. Walker v. State, 38 Ala.App. 204, 84 So.2d 383
(1955).'
 "McMurphy v. State, 455 So.2d 924, 929
(Ala.Cr.App.[1984]). The only bias attributed to the trial judge in Woodall's arguments to this court is judicial in nature. Woodall alleges no personal or extra judicial bias on the part of the trial judge. The bare assertions that the trial judge should recuse merely because he is presiding over related cases are meritless."
730 So.2d at 638. See also Key v. State, 891 So.2d 353
(Ala.Crim.App. 2002) (no error in denying motion to recuse on the ground that trial judge had presided over previous criminal proceeding against the defendant), aff'd, 891 So.2d 384 (Ala. 2004).
In this case, the only bias on the part of Judge Johnson Carruth alleged is judicial in nature — stemming from Judge Johnson's presiding over two bond-forfeiture cases involving Carruth's employer and Judge Johnson's off-the-record comments when Carruth applied for recertification on behalf of his employer. Carruth has failed to show, or even to allege, any personal bias on the part of Judge Johnson stemming from an extrajudicial source. Moreover, there is no reasonable question as to Judge Johnson's impartiality or any appearance of impropriety. Merely because Judge Johnson ruled against Tri-County in the bond-forfeiture hearings at which Carruth was Tri-County's representative *Page 875 
does not create an appearance of impropriety and, as Carruth admitted during cross-examination, Judge Johnson entered final forfeitures against all bonding companies "equally." (R. 187.) Although Carruth found Judge Johnson's demeanor at the forfeiture hearings to be less than cordial, a judge's demeanor during a judicial proceeding is not sufficient to warrant recusal. "A judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration — remain immune." Liteky v. United States,510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Finally, as Judge Johnson noted during the recusal hearing, any comments he made to Carruth when Carruth applied for recertification on behalf of Tri-County were "not . . . reference[s] to anyone else but to [him]self" (R. 205), and, thus, do not create an appearance of impropriety.
There was no basis for Judge Johnson to recuse himself in this case; therefore, he properly denied Carruth's motion to recuse.
 II.
Carruth contends that the trial court erred in denying his motion for a change of venue based on pretrial publicity.
 "The yardstick by which this court measures the correctness of a trial court's ruling on a motion for change of venue is whether the trial court `abused its discretion' in denying the motion.
 "`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'
 Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App. 1983). See also Trahan v. State, 450 So.2d 1102
(Ala.Cr.App. 1984). An appellant must prove a `gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So.2d 1364
(Ala.Cr.App. 1983).
 "In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600
(1966); Rideau[v. Louisiana, 373 U.S. 723 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir. 1983).
 "The `actual prejudice' standard is defined as follows:
 "`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." *Page 876 Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643
[6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544.
 ". . . Th[e `presumed prejudice'] standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App. 1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
 "In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847
(1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations.' Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few . . . cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
 "[The defendant has] the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App. 1993), aff'd, 642 So.2d 1060 (Ala. 1994). "Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,"' Hartv. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed,612 So.2d 536 (Ala. 1992), cert. denied, [508] U.S. [953],113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana,373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated." Oryang v. State,642 So.2d 979, 983 (Ala.Crim.App. 1993). Moreover, "the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive." Ex parte Travis,776 So.2d 874, 878 (Ala. 2000).
In support of his motion for a change of venue, Carruth submitted several newspaper articles that had been published about the case; most of those articles were printed within two months of the murder, and all but one of the remaining articles were printed approximately a year later, in February 2003, over seven months before Carruth's trial began in September 2003. One article appeared in a local newspaper the weekend before jury selection began. We have examined the articles presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. To warrant a change of venue under the presumed prejudice standard, "it must be *Page 877 
shown that the pre-trial publicity surrounding the case was inherently prejudicial," Holladay v. State, 549 So.2d 122, 125
(Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala. 1989); "the publicity must be both extensive and sensational in nature."Perkins v. State, 808 So.2d 1041, 1069 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to 851 So.2d 453 (Ala. 2002). "`"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible."'"Oryang, 642 So.2d at 983, quoting Thompson v. State,581 So.2d 1216, 1233 (Ala.Crim.App. 1991), quoting in turn McLarenv. State, 353 So.2d 24, 31 (Ala.Crim.App. 1977). "`If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.'"Perkins, 808 So.2d at 1069, quoting United States v. Angiulo,897 F.2d 1169, 1181 (1st Cir. 1990).
We do not find that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality." Oryang,642 So.2d at 983. Nor do we find that the publicity was so inherently prejudicial as to create a presumption of prejudice. Carruth has failed to prove that the media reports so inflamed or saturated the community as to create an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice.
In addition, we have thoroughly reviewed the record and we find no evidence of actual prejudice on the part of any juror who sat on Carruth's jury. The jury venire, consisting of 85 prospective jurors,[4] was questioned extensively and thoroughly in an individual, sequestered setting. While the majority of the prospective jurors had read or heard media reports about the case and many had formed opinions about the case based on those reports, only six stated that they had such fixed opinions of Carruth's guilt based on the media coverage that they would be unable to set aside those opinions and render a decision based solely on the evidence, and those jurors were removed for cause. In addition, although 10 of the 12 jurors who ultimately decided the case indicated during voir dire that they had read or heard media reports, those 10 jurors also indicated that they could set aside what they had read or heard and base their decision solely on the evidence presented during the trial.
 "As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
 "`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of *Page 878 
the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)."
Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985).
 "[T]he fact that even a majority of the prospective jurors had preconceived notions of the guilt of the accused does not require a change of venue where there is evidence that the jurors would be able to lay aside their impressions or opinions and render a verdict based on the evidence presented in court. Callahan v. State, 471 So.2d 447, 452 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Callahan, 471 So.2d 463 (Ala. 1985). `The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984)."
Fortenberry v. State, 545 So.2d 129, 141 (Ala.Crim.App. 1988), aff'd, 545 So.2d 145 (Ala. 1989).
Carruth has failed to show either that the community was saturated with such prejudicial pretrial publicity as to create a presumption of prejudice or that actual prejudice existed among the jurors at his trial. The media coverage was not so sensational and inflammatory as to create a presumption of prejudice, and the record contains no indication that any juror who sat on Carruth's jury had such a fixed opinion of Carruth's guilt that he or she could not render an impartial verdict based on the evidence presented at trial. Therefore, the trial court did not abuse its discretion in denying Carruth's motion for a change of venue.
 III.
Although the issue was not argued by Carruth on appeal or mentioned by the State in its brief, we are obligated to take notice that Carruth's convictions for both capital murder during a burglary and burglary in the first degree, as well as his convictions for both capital murder during a robbery and robbery in the first degree, violate the principles of double jeopardy.[5]
Carruth was charged with capital murder during a burglary as follows:
 "The Grand Jury of said county further charge that, before the finding of this indictment, Michael D. Carruth, whose true name is otherwise unknown to the Grand Jury than as stated, did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Michael D. Carruth caused said death during the time that Michael D. Carruth was in the course of knowingly and unlawfully entering or remaining unlawfully in a dwelling with the intent to commit a crime therein[6] and in effecting *Page 879 
entry or while in the dwelling or in immediate flight therefrom, Michael D. Carruth or another participant in the crime was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-5-40(a)(4) of the Code of Alabama, 1975, as amended and against the peace and dignity of the State of Alabama."
(C. 47.) Carruth was charged with capital murder during a robbery as follows:
 "The Grand Jury of said county further charge that, before the finding of this indictment, Michael D. Carruth, whose true name is otherwise unknown to the Grand Jury than as stated, did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Michael D. Carruth caused said death during the time that Michael D. Carruth was in the course of committing a theft of currency of the United States of America, a further and better description being otherwise unknown to the Grand Jury, the property of Forest [F.] Bowyer, by the use of force against the person of Forest [F.] Bowyer, with intent to overcome his physical resistance or physical power of resistance, while the said Michael D. Carruth was armed with a deadly weapon, to-wit: a knife or other sharp instrument and or a pistol, a further and better description being otherwise unknown to the Grand Jury, in violation of Section 13A-5-40(a)(2) of the Code of Alabama 1975, as amended, and against the peace and dignity of the State of Alabama."
(C. 47.) Carruth was also charged with burglary in the first degree as follows:
 "The Grand Jury of said county charge that, before the finding of this indictment, Michael D. Carruth, whose name is otherwise unknown to the Grand Jury, did knowingly and unlawfully enter or remain unlawfully in a dwelling of Forest F. Bowyer, with intent to commit a crime therein, to-wit: robbery, and while effecting entry or while in the dwelling or in immediate flight therefrom, said defendant did cause physical injury to Forest F. Bowyer, in violation of Section 13A-7-5 of the Code of Alabama, 1975, and against the peace and dignity of the State of Alabama."
(C. 1936.) And Carruth was charged with robbery in the first degree as follows:
 "The Grand Jury of said county charge that, before the finding of this indictment, Michael D. Carruth, whose name is otherwise unknown to the Grand Jury than as stated, did, in the course of committing a theft of currency of the United States of America a further and better description being otherwise unknown to the Grand Jury, the property of Forest F. Bowyer, use force or threaten the imminent use of force against the person of Forest F. Bowyer, with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said Michael D. Carruth was armed with a deadly weapon or dangerous instrument, to-wit: a knife or other sharp instrument a further and better description being otherwise unknown to *Page 880 
the Grand Jury, in violation of Section 13A-8-41 of the Code of Alabama 1975, against the peace and dignity of the State of Alabama."
(C. 1365.)
 "It is well settled that `[a] defendant cannot be convicted of both a capital offense and a lesser offense that is included in the capital charge.' Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003). See also Turner v. State, 924 So.2d 737 (Ala.Crim.App. 2002). Section 13A-1-8(b), Ala. Code 1975, provides, in pertinent part:
 "`(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
 "`(1) One offense is included in the other, as defined in Section 13A-1-9.'
 "Such a double-jeopardy transgression implicates the jurisdiction of the trial court and must be noticed by this Court regardless of whether it was raised. See, e.g., Straughn v. State, 876 So.2d 492
(Ala.Crim.App. 2003) (opinion on return to remand and on application for rehearing); Borden v. State, 711 So.2d 498 (Ala.Crim.App. 1997), aff'd, 711 So.2d 506
(Ala. 1998); and Rolling v. State, 673 So.2d 812
(Ala.Crim.App. 1995)."
Buford v. State, 891 So.2d 423, 435-36 (Ala.Crim.App. 2004).
The burglary underlying the indictment for capital murder during a burglary was the same burglary that formed the basis for the separate burglary indictment. Although the capital indictment charged that Carruth committed the burglary while armed with a deadly weapon, see § 13A-7-5(a)(1), Ala. Code 1975, and the burglary indictment charged that Carruth caused physical injury to Forest Bowyer, see § 13A-7-5(a)(2), Ala. Code 1975, subsections (a)(1) and (a)(2) of § 13A-7-5 are merely alternative means of proving the crime of burglary in the first degree. See, e.g.,Perkins v. State, 897 So.2d 457 (Ala.Crim.App. 2004), and the cases cited therein. Likewise, the robbery underlying the indictment for capital murder during a robbery was the robbery of Forest Bowyer, the same robbery that formed the basis for the separate robbery indictment. See, e.g., Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___ (Ala.Crim.App. 2003). Therefore, Carruth's convictions for burglary and robbery violate double-jeopardy principles and must be vacated.
 IV.
Because this case involves the death penalty we have, in accordance with Rule 45A, Ala.R.App.P., examined the record for any plain error with respect to Carruth's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Carruth's sentence in accordance with §13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Carruth's capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section13A-5-53(b) requires that, *Page 881 
in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Carruth of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury unanimously recommended that Carruth be sentenced to death.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence Carruth to life imprisonment without the possibility of parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under §13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Carruth's participation in it.
In its findings, the trial court found the existence of four statutory aggravating circumstances: (1) that the murder was committed during the course of a robbery, see § 13A-5-49(4), Ala. Code 1975; (2) that the murder was committed during the course of a burglary, see § 13A-5-49(4), Ala. Code 1975; (3) that the murder was committed during the course of a kidnapping, see § 13A-5-49(4), Ala. Code 1975; and (4) that the murder was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Carruth had no significant history of prior criminal activity, see § 13A-5-50(1), Ala. Code 1975. The trial court also heard arguments regarding Carruth's character and record and any of the circumstances of the offense that Carruth offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975. In this regard, the trial court found no nonstatutory mitigating circumstances to exist.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstance, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Carruth to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings. *Page 882 
Carruth was convicted of murder committed during the course of a kidnapping, robbery, and burglary, and murder of a victim who was less than 14 years of age. These offenses are defined by statute as capital offenses. See § 13A-5-40(a)(1), (2), (4), and (15), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g.,Lewis v. State, 889 So.2d 623 (Ala.Crim.App. 2003), and the cases cited therein dealing with murders committed during a kidnapping; Eggers v. State, 914 So.2d 883 (Ala.Crim.App. 2004), and the cases cited therein dealing with murders committed during a robbery; Hall v. State, 820 So.2d 113, (Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001), and the cases cited therein dealing with murders committing during a burglary; andMinor v. State, 914 So.2d 372 (Ala.Crim.App. 2004), and the cases cited therein dealing with murders of children less than 14 years of age.
After carefully reviewing the record of the guilt phase and of the penalty phase of Carruth's trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstance, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstance, and we agree that death is the appropriate sentence in this case. Considering the crime committed and Carruth, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Based on the foregoing, we affirm Carruth's capital-murder convictions and his sentence of death. We likewise affirm Carruth's conviction and sentence for attempted murder. However, for the reasons stated in Part III of this opinion, we reverse Carruth's convictions and sentences for robbery and burglary and remand this case for the trial court to vacate those convictions and sentences.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Brooks was also convicted of attempted murder, burglary, robbery, and four counts of capital murder, and was sentenced to death. Brooks's appeal is currently pending before this Court (case no. CR-03-1113).
[2] We note that although the trial court's statements at the recusal hearing suggest that the transcript introduced was a transcript from a hearing on March 7, 2000, the copy of the transcript contained in the record has the date May 7, 2002. (C. 2629.)
[3] Following the denial, Carruth filed a petition for a writ of mandamus in this Court; we denied the petition without an opinion.
[4] There were originally 102 prospective jurors on the venire; 17 of those were excused by the court.
[5] Although not mentioned by the State in its brief in this case, we note that in its brief filed in the capital-murder case of Carruth's codefendant, Jimmy L. Brooks, Jr. (CR-03-1113), the State concedes that Brooks's convictions for burglary and robbery violate double jeopardy. (State's brief in CR-03-1113 at p. 39 n. 6.)
[6] Although the indictment did not allege the specific crime Carruth intended to commit inside the dwelling, see, e.g.,Lanier v. State, 733 So.2d 931, 936 (Ala.Crim.App. 1998), andPopwell v. State, 480 So.2d 41, 45 (Ala.Crim.App. 1985) (both holding that a burglary indictment must allege the specific crime the accused intended to commit within the dwelling), the trial court amended the indictment during its jury instructions when it instructed the jury that to find Carruth guilty of capital murder during a burglary it had to find that Carruth intended to commit the crime of theft inside the dwelling. See, e.g., Ash v.State, 843 So.2d 213 (Ala. 2002) (a trial court can amend an indictment through its jury instructions), and Hampton v.State, 815 So.2d 571 (Ala.Crim.App. 2001) (holding that an indictment that fails to charge a mens rea element but otherwise validly charges a crime may be amended to add the mens rea element).